William J. Honan (WJH 1922)
Michael J. Frevola (MJF 8359)
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY 10007-3189
(212) 513-3200

ATTORNEYS FOR PLAINTIFF
WILHELMSEN PREMIER MARINE FUELS AS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| WILHELMSEN PREMIER MARINE FUELS AS,<br><br>            Plaintiff,<br><br>    -against-<br><br>UBS PROVEDORES PTY LTD. a/k/a<br>USS-UBS INTERNATIONAL and<br>RAECORP INTERNATIONAL PTY LTD.,<br><br>          Defendants. | 07 Civ. 5798 (CM) |

## MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO VACATE MARITIME ATTACHMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ii

PRELIMINARY STATEMENT ........................................................................1

STATEMENT OF FACTS.................................................................................1

ARGUMENT ....................................................................................................5

I.  Wilhelmsen's Claim is Subject to Admiralty Jurisdiction............................5

   A.  Claims for Provisions of Bunkers to a Vessel Are Inarguably
      Maritime .................................................................................................6

   B.  Claims by a "Supplier" of Bunkers Remain Maritime Even
      Where a Local Supplier Actually Provides the Bunkers to the
      Vessel on Behalf of a "Broker"...........................................................9

   C.  Wilhelmsen Was Not a Broker, the Agreements Were Not Otherwise
      "Preliminary" Contracts, and UBS's Other Arguments Do Not Apply
      In This Factual Scenario ......................................................................14

II.  Wilhelmsen has Adequately Stated a *Prima* Facie Admiralty Claim
    Against Raecorp, Thereby Satisfying Wilhelmsen's Burden Under
    The Rule E(4)(f) Inquiry ......................................................................18

   A.  Plaintiff Has Satisfied Its Burden of Alleging a "*Prima Facie*
      Admiralty Claim" ..................................................................................18

III.  The Electronic Fund Transfers That Have Been Attached Are
     "Property" Under The Law Of This Circuit ........................................24

IV.  Interlocutory Appeal Is Not Warranted..................................................24

CONCLUSION .................................................................................25

# TABLE OF AUTHORITIES

## CASES

*A. Coker & Co. v. Nat'l Shipping Agency Corp.*,
No. 99-1440, 1999 WL 311941 (E.D. La. May 17, 1999)................................................22-23

*Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*
460 F.3d 434 (2d Cir. 2006)............................................................................................18-19

*A/S Dan-Bunkering Ltd. v. M/V ZAMET*,
945 F. Supp. 1576 (S.D. Ga. 1996)................................................................................10, 12

*Compania Sudamericana de Vapores S.A. v. Sinochem Tianjin Co.*,
No. 06 Civ. 13765, 2007 WL 1002265 (S.D.N.Y. Apr. 4, 2007).............................................25

*Dolco Invest. Ltd., v. Moonriver Dev., GML*,
486 F. Supp. 2d 261 (S.D.N.Y 2007).................................................................................19

*Dow Chem. Pac. Ltd. v. Rascator Marit. S.A.*,
782 F.2d 329 (2d Cir. 1986)..............................................................................................20

*Exxon Corp. v. Central Gulf Lines, Inc.*,
500 U.S. 603 (1991)..............................................................................................6-8, 14, 16

*Exxon Corp. v. Central Gulf Lines, Inc.*,
780 F. Supp. 191 (S.D.N.Y. 1991) .......................................................................................16

*Fesco Ocean Mgmt. v. High Seas Shipping*,
No. 06 Civ. 1055, 2007 WL 766115 (S.D.N.Y. Mar. 12, 2007) .......................................19, 21

*Folksamerica Reins. Co. v. Clean Water of N.Y., Inc.*,
413 F.3d 307 (2d Cir. 2005)...............................................................................5-6, 16, 18

*Galehead, Inc. v. M/V ANGLIA*,
15 F. Supp. 2d 1304 (S.D. Fla. 1998),
*aff'd in part and rev'd in part*, 183 F.3d 1242 (11th Cir. 1999).................................................10

*Galehead, Inc. v. M/V ANGLIA*,
183 F.3d 1242 (11th Cir. 1999) .......................................................................................9-11

*Gulf Marine & Indus. Supplies, Inc. v. New Filipino Mart. Agencies, Inc.*,
No. 01-0555, 2001 WL 277924 (E.D. La. Mar. 20, 2001) .......................................................11

*Hampton Bermuda Ltd. v. M/V STAR SIRANGER*,
No. H-05-3074, 2007 WL 677263 (S.D. Tex. Feb. 28, 2007).................................................12

*Japan Line, Ltd. v. Willco Oil Ltd.*,
    424 F. Supp. 1092 (D. Conn. 1976) ..................................................................18

*Kossick v. United Fruit Co.*,
    365 U.S. 731 (1961) ..............................................................................6, 14

*Lee v. M/V GEM OF MADRAS*,
    No. H-05-0631, 2006 WL 568545 (S.D. Tex. Mar. 6, 2006) ................................12

*Linea Naviera Carbotrade v. Mar Caribe De Navegacion*,
    169 F. Supp. 2d 1341 (M.D. Fla. 2001) ....................................................... 22-24

*Maersk, Inc. v. Neewra, Inc.*,
    No. 05 Civ. 4356 (RCC), 2006 WL 2168452 (S.D.N.Y. Aug. 1, 2006) ..................22

*Minturn v. Maynard*,
    58 U.S. (17 How.) 477 (1854) ......................................................................7

*N. Pac. S.S. Co. v. Hall Bros. Marine Ry. & Shipbuilding Co.*,
    249 U.S. 119 (1919) ................................................................................6

*N. Tankers (Cyprus) Ltd. v. Backstrom*,
    967 F. Supp. 1391 (D. Conn. 1997) ..............................................................20

*New England Mut. Marine Ins. Co. v. Dunham*,
    78 U.S. 1 (1870) ....................................................................................6

*Norfolk S. Ry. Co. v. James N. Kirby, Pty Ltd.*,
    543 U.S. 14 (2004) ........................................................................ 5-6, 16, 18

*Royal Swan Navigation Co. v. Global Container Lines*,
    868 F. Supp. 599 (S.D.N.Y. 1994) ................................................................19

*Salazar v. The ATLANTIC SUN*,
    881 F.2d 73 (3d Cir. 1989) .........................................................................22

*Seamar Shipping Corp. v. Kremikovtzi Trade Ltd.*,
    461 F. Supp. 2d 222 (S.D.N.Y. 2006) ........................................................ 24-25

*Sea Transp. Contractors v. Indus. Chimiques du Senegal*,
    411 F. Supp. 2d 386 (S.D.N.Y. 2006) ........................................................ 14-17

*SPL Shipping, Ltd. v Gujarat Cheminex, Ltd.*,
    No. 06 Civ. 15375, 2007 WL 831810 (S.D.N.Y. Mar. 15, 2007) .....................19, 21

*The GOLDEN GATE,*
  52 F.2d 397 (9th Cir. 1931) ...................................................................................10, 12

*Tide Line Inc., v. Eastrade Commodities Inc.,* No. 06 Civ. 1979,
  2006 WL 4459297, 2007 A.M.C. 252 (S.D.N.Y. 2006)...................................... 18-19

*Tramp Oil & Marine, Ltd. v. M/V MERMAID I,*
  805 F.2d 42 (1st Cir. 1986).....................................................................................12

*Trans-Tec Asia v. M/V HARMONY CONTAINER,*
  No. CV 04-1160, 2004 WL 3820556 (C.D. Cal. Dec. 28, 2004) ...........................13

*Trans-Tec Asia v. M/V HARMONY CONTAINER,*
  435 F. Supp. 2d  1015 (C.D. Cal. 2005) .................................................................13

*Ullises Shipping Corp. v. Fal Shipping Co.,*
  415 F. Supp. 2d 318 (S.D.N.Y. 2006)............................................................... 22-23

*Universal Shipping, Inc. v. Panamanian Flag Barge,*
  563 F.2d 483 (1st Cir. 1976)....................................................................................16

*Wajilam Exports (Singapore) Pte. Ltd. v. ATL Shipping Ltd.,*
  475 F. Supp. 2d 275 (S.D.N.Y. 2006).....................................................................22

*Winter Storm Shipping Ltd. v. TPI,*
  310 F.3d 263 (2d Cir. 2002).....................................................................................24

## PRELIMINARY STATEMENT

In challenging Wilhelmsen's Rule B attachment of UBS's funds, UBS and Raecorp raise three principal issues:

1.    Is the contract between UBS and Wilhelmsen for the sale and purchase of bunker fuel a maritime contract notwithstanding Wilhelmsen's status as a "middle-man" and notwithstanding that the bunker fuel was supplied to the vessel by a Wilhelmsen sub-contractor?

2.    Has Wilhelmsen, in its Amended Verified Complaint, stated a *prima facie* case against co-defendant Raecorp?

3.    Does the Second Circuit's decision in *Winter Storm Shipping* remain good law within this District and should the Court certify an interlocutory appeal to permit a challenge of that decision under 28 U.S.C. §1292?

Wilhelmsen respectfully requests the Court to find (i) that the UBS/Wilhelmsen contract is maritime in nature, (ii) that Wilhelmsen has stated a *prima facie* case against Raecorp and (iii) that the Second Circuit's decision in *Winter Storm* remains good law and the Court should not certify the present case for an interlocutory appeal.

## STATEMENT OF FACTS[1]

Wilhelmsen acts as both a broker and a supplier of bunkers to seagoing vessels at a variety of ports worldwide.  Affirmation of Hans Borge ("Borge Aff."), ¶ 3.  Here, Wilhelmsen entered into a series of agreements with UBS to provide vessels nominated by UBS with bunkers in the ports of Sasebo and Naha in Japan.  *Id.* ¶ 4.  Each time that UBS contacted Wilhelmsen to bunker a nominated vessel, Wilhelmsen confirmed the terms of that agreement and incorporated

---

[1]  Because of page constraints and the magnitude of supporting information, the Statement of Facts summarizes the accompanying supports and cites to them for further details.

the terms and conditions of the local supplier, Sumitomo Corporation Europe Ltd. ("Sumitomo"), as governing the relationship between UBS and Wilhelmsen. *Id.* ¶ 5 & Exs. 2, 3. In accepting UBS's nominations, Wilhelmsen undertook to bunker the nominated vessel under the Sumitomo terms, and it would be responsible to UBS for a failure to bunker a vessel in the specified Japanese port at the designated time. *Id.* ¶ 6.

Wilhelmsen did not use its own employees and services to physically supply the bunkers that were requested by UBS for the nominated vessel. *Id.* ¶ 7. Instead, as is common in the bunkering industry, Wilhelmsen used a local supplier to physically supply the vessel in accordance with its instructions. *Id.* In doing so, Wilhelmsen contracted with a local supplier, Sumitomo, to carry out the requested bunkering operations. *Id.*; *see also* Affirmation of Alan Hillgrove ("Hillgrove Aff."), ¶ 4. Ten separate times, Wilhelmsen performed under its contract with UBS by purchasing bunkers from Sumitomo and ordering it to bunker the nominated vessel. Borge Aff., ¶ 4(a)-(j); Hillgrove Aff., ¶ 3(a)-(j). Sumitomo invoiced Wilhelmsen for each of these ten nominations; all have been paid in full. Borge Aff., ¶ 8; Hillgrove Aff., ¶¶ 4(a)-(j), 6 & Ex. 1. UBS, however, has not paid Wilhelmsen. Borge Aff., ¶ 10.

UBS claims that it has not been paid by the U.S. government for the Wilhelmsen bunkerings because Wilhelmsen has failed to produce substantiating documentation. UBS conveniently failed to introduce a copy of its government contract to support its contention that it needed the Wilhelmsen documentation to be paid. Why? Because the falsity of UBS's representation is apparent upon reviewing the terms of UBS's contract with the Defense Energy Support Center ("DESC"). The UBS/DESC contract clearly states several times that additional expenses (such as for barging, storage, etc.) are to be included in the bidder's per metric ton, FOB terms bunker bid:

> **SHIPS' BUNKERS.** Unless otherwise stated, the supplies shall be furnished ***f.o.b. destination*** as ships' bunkers into various types and sizes of U.S. military and federal civilian vessels for immediate consumption by the vessel. ***Unit prices are for product delivered inclusive of all delivery charges.***

Affidavit of Michael Frevola ("Frevola Aff."), Ex. 2, Page 2 of 76 (emphasis supplied).

> **NOTE: *Offer prices must be "as delivered." Prices should include all delivery costs***, applicable taxes (except those to be listed separately on invoices), and any other charges, ***given in US dollars per Metric Ton.***

*Id.*, Page 8 of 76 (emphasis supplied).

> **F.O.B. DESTINATION (NOV 1991)**
>
> (a) The term "***f.o.b. destination***," as used in this clause, means –
>
> > (1) ***Free of expense to the Government, on board the carrier's conveyance, at a specified delivery point [here, the nominated vessels]*** . . . .
> >
> > \*   \*   \*
>
> (b) ***The Contractor shall –***
>
> > \*   \*   \*
>
> > (6) ***Pay and bear all charges to the specified point of delivery.***

*Id.*, Page 58 of 76 (emphasis supplied).

Not only does the UBS/DESC contract make clear that UBS has no claim for which UBS requires the purported Wilhelmsen documentation, but also U.S. government representatives from both DESC and Military Sealift Command have confirmed that UBS has been paid in full for the Wilhelmsen bunkerings. *See id.*, ¶¶ 5-7; Borge Aff., ¶ 13 & Ex. 7. In fact, the Military Sealift Command Fuels Manager made it quite clear that UBS's "claims" had nothing to do with the Wilhelmsen bunkerings and that UBS's claims essentially have been manufactured in a desperate attempt to mitigate the losses UBS has sustained for grossly underbidding on this government contract that it is committed to perform for the next four years:

> ***I will assure you that I have personally seen eviden[ce] that USS-UBS has been paid for fuel and services rendered to MSC ships in Sasebo, and Yokohama and the price that was paid is the daily contract price that has been authorized on the Contract.*** That said, USS-UBS has a claim into Defense Fuels, Bunker

Contract Division for $3.55 million (us). ***This claim is not for fuel delivered to the ship or services to the ships but for storage of fuel in Sasebo and losses incurred by the Contractor for this fuel when it was sold.***

\* \* \*

Lastly, I will tell you that the invoiced price for fuel by USS-UBS was an average of $243.50 per metric ton higher than any spot market price for fuel in the area and the invoice price was not IAW with the daily metric ton price allowed by the DESC Contract. Additionally, USS-UBS has submitted claims for services such as overtime at $300 per hour for periods of 24, 48, and 72 hours for time that the Contractor or Sub-Contractor was filling the barge at the distribution point/refinery/whole seller . . . . Obviously, I am not a fool but these are just a few examples of the USS-UBS claims that have been submitted to Defense Fuels and forwarded to me.

One last item, less the claims that I have cited above, ***all invoices for fuel to MSC's ships since 1 October 2006 thru 23 July 2007 have been paid to USS-UBS.***

Borge Aff., Ex. 7 (emphasis added).

Wilhelmsen always has quoted a FOB rate (all expenses included to delivery alongside the nominated vessel) to UBS and never has added on extra transportation or other expenses. *Id.* ¶¶ 11-12. Overtime, which UBS alleges it expended, is unheard of in the Japanese bunker industry. Hillgrove Aff., ¶ 8. UBS's contentions are fabrications designed to shift the equities of this proceeding in the forlorn hope that it can free the funds that Wilhelmsen has attached to secure a portion of the damages it has suffered at the hands of UBS.

As the accompanying Borge Affirmation explains in detail, UBS grossly miscalculated its expenses in reaching a bid price for this government contract. Borge Aff., ¶¶ 14-16. In doing so, UBS apparently failed to take into account (1) that the industry publications quoting fuel prices in Tokyo Bay, Japan were quoting a much less expensive product, and (2) were not including the extremely significant transportation costs involved in employing Japanese coastwise vessels to transport the bunkers to the remote locals nominated. *Id.*

UBS also contends that Wilhelmsen acted as a bunker broker in participating in the bunkering of the vessels at issue in this dispute. A significant part of Wilhemsen's business does

4

involve acting as a bunker broker, and Wilhelmsen is one of the larger bunker brokers in the world.  *Id.* ¶ 17.  In this transaction, however, Wilhelmsen entered into separate contracts with both UBS and with Sumitomo for the bunkering of the nominated vessel; UBS did not enter into a direct contract with Sumitomo.  *Id.*  Wilhelmsen's compensation for participating in these transactions never was based on a commission resulting from the confirmation of a contract between UBS and Sumitomo.  *Id.*  UBS also has threatened to sue Wilhelmsen for an alleged contamination of bunkers.  *Id.* ¶ 18.  It likewise reserved its rights at the scheduling conference to seek counter-security on that claim.  *See* Frevola Aff., Ex. 4, Transcript Page 11.  These claims never would be brought against a broker; but they would against a contractual counterpart.

UBS also claims that the primary purpose of Wilhelmsen's involvement in this case as providing introductions to local suppliers in Japan and provided extensions of credit to UBS through which UBS could complete its bunkering transactions with local suppliers.  As Mr. Borge's affirmation explains, Wilhelmsen does offer credit terms in order to position itself favorably against its competition.  As he further explains, however, this hardly is the primary nature of the services Wilhelmsen offers.  *See* Borge Aff., ¶ 19.

## ARGUMENT

### POINT I

### WILHELMSEN'S CLAIM IS SUBJECT TO ADMIRALTY JURISDICTION

Defining whether a contract is subject to admiralty jurisdiction requires a conceptual approach rather than a spatial approach.  *Norfolk S. Ry. Co. v. James N. Kirby, Pty Ltd.*, 543 U.S. 14, 23 (2004) (citation omitted); *accord Folksamerica Reins. Co. v. Clean Water of N.Y., Inc.*, 413 F.3d 307, 311 (2d Cir. 2005).  As facts vary case by case, great importance is placed in resolving this jurisdictional question on how such contracts have been treated in the past.

*Folksamerica*, 413 F.3d at 311 (noting the Supreme Court's "instruct[ion] that '[p]recedent and usage are helpful insofar as they exclude or include certain common types of contract'") (quoting *Kossick v. United Fruit Co.*, 365 U.S. 731, 735 (1961)).

In analyzing whether a contract is subject to admiralty jurisdiction, courts are required to "look to the contract's "nature and character" to see 'whether it has 'reference to maritime service or maritime transactions.""" *Id.* (quoting *Kirby*, 543 U.S. at 24 (quoting *N. Pac. S.S. Co. v. Hall Bros. Marine Ry. & Shipbuilding Co.*, 249 U.S. 119, 125 (1919)) and citing *New England Mut. Marine Ins. Co. v. Dunham*, 78 U.S. 1, 26 (1870)). The discussion below demonstrates that the principal objective of the UBS/Wilhelmsen contract was to bunker a vessel and thus provide that vessel with the motive force to ply the ocean. The provision of bunkers to a vessel has been treated for at least a century as a fundamental component of maritime commerce.

**A.    Claims for Provision of Bunkers to a Vessel Are Inarguably Maritime**

As an initial matter, there is no question that a contract for the provision of bunkers to a vessel is a maritime contract subject to admiralty jurisdiction. *Exxon Corp. v. Central Gulf Lines, Inc.*, 500 U.S. 603, 612 (1991). The underlying transaction for which all parties were retained – UBS, Wilhelmsen, and Sumitomo – was to bunker U.S. vessels. In *Exxon*, the Supreme Court overturned the longstanding judicial exception to admiralty jurisdiction in connection with agency contracts. The Court analyzed a fuel requirements contract similar to the UBS/DESC contract here. Exxon directly supplied bunkers to vessels in certain ports (New York), but subcontracted the physical supply function to local suppliers in ports where Exxon did not have the capability (Jeddah, Saudi Arabia was involved in the dispute). *Id.* at 605.

Exxon brought its claims in the Southern District of New York under the court's admiralty jurisdiction. The district court, relying on nearly a century of precedent holding that

6

"preliminary contracts" and "agency contracts" fell outside the court's admiralty jurisdiction, rejected Exxon's contention that its claims for the Jeddah bunkering services fell within admiralty jurisdiction. *Id.* at 607. The Second Circuit affirmed the district court for the reasons given in the district court's original decision and further decision on reconsideration. *Id.*

On appeal, the Supreme Court overruled the "*per se* exception" to admiralty jurisdiction in the context of agency contracts and held that Exxon's claims based on the Jeddah bunkering services were subject to admiralty jurisdiction. Justice Marshall, writing for a unanimous Court, overruled the exception created by *Minturn v. Maynard*, 58 U.S. (17 How.) 477 (1854), because using a bright line rule to exclude contracts regardless of subject matter *based on the status of the claimant* was not consistent with the Constitution's grant of federal admiralty jurisdiction:

> Finally, the proposition for which *Minturn* stands – a *per se* bar of agency contracts from admiralty – ill serves the purpose of the grant of admiralty jurisdiction. As noted, the admiralty jurisdiction is designed to protect maritime commerce. [citation omitted]. There is nothing in the nature of an agency relationship that necessarily excludes such relationships from the realm of maritime commerce. Rubrics such as "general agent" and "special agent" reveal nothing about whether the services actually performed pursuant to a contract are maritime in nature. *It is inappropriate, therefore, to focus on the status of a claimant to determine whether admiralty jurisdiction exists.*

*Exxon*, 500 U.S. at 611-612 (emphasis added).

Turning to the subject matter of the dispute before the Court, the *Exxon* Court focused on whether Exxon's delivery of fuel in Jeddah through a local physical supplier (rather then itself) constituted a maritime transaction. Holding that the subject matter of both transactions – the value of the fuel received by the ship – was identical, the Court concluded that Exxon's claims for the Jeddah bunkering performed by a local physical supplier must be subject to admiralty jurisdiction because the New York claims clearly qualified as such:

> In this case, the only difference between the New York delivery over which the District Court asserted jurisdiction, *see* n. 2, *supra,* and the Jeddah delivery was

7

> that, in Jeddah, Exxon bought the fuels from a third party and had the third party deliver them to the *Hooper*. The subject matter of the Jeddah claim, like the New York claim, is the value of the fuel received by the ship. *Because the nature and subject-matter of the two transactions are the same as they relate to maritime commerce, if admiralty jurisdiction extends to one, it must extend to the other.*

*Id.* at 612-613 (emphasis added).

Here, similar to the *Exxon* case, UBS contracted with Wilhelmsen to carry out the supplying of fuel to the vessels. Wilhelmsen entered into a similar transaction by transaction agreements with UBS for bunkering U.S. government vessels in Japan. By agreeing to supply those vessels, Wilhelmsen similarly obligated itself to physically fuel the vessels itself or to find a local supplier from which to purchase fuel to carry out its contractual obligations to UBS. The correspondence from Wilhelmsen to UBS in which UBS's vessel nomination was confirmed always referenced Sumitomo's Terms and Conditions as applying to the UBS/Wilhelmsen transaction. The Sumitomo Terms make clear that Wilhelmsen contracted with UBS to fuel the designated vessels, and that Wilhelmsen would be liable to UBS for a failure to do so.

Hence, the subject matter of the UBS/Wilhelmsen contracts was to fuel the vessels nominated by UBS in accordance with the Sumitomo Terms. Wilhelmsen could bunker the vessels itself, or it could choose to subcontract that obligation to a local supplier. In either case, the *Exxon* Court made clear that Wilhelmsen's contract with UBS is a maritime contract regardless of whether Wilhelmsen performed the bunkering itself or contracted our for the performance of that obligation. The UBS/Wilhelmsen agreements are classic maritime contracts for the provision of necessaries to a vessel. Although UBS misrepresents the nature of the UBS/Wilhelmsen contract, and even fabricates a basis for non-payment in blaming Wilhelmsen for its purported "failure" to adequately document its bunker invoices, UBS's attempts to avoid maritime jurisdiction do not withstand close scrutiny.

8

**B.    Claims by a "Supplier" of Bunkers Remain Maritime Even Where a Local Supplier Actually Provides the Bunkers to the Vessel on Behalf of a "Broker"**

UBS argues that Wilhelmsen acted as a broker in bunkering operations and that brokerage contracts are not considered maritime contracts. To support this proposition, UBS cites cases involving charter brokers (brokers retained to locate charterers of vessels for a vessel owners), insurance brokers (retained to procure vessel insurance), and one case involving a financial service company. Charter broker and insurance broker claims long have been held to be non-maritime. Tellingly, however, UBS fails to cite a single fuel broker case to support its position that a fuel brokerage agreement is not subject to admiralty jurisdiction. It also chooses not to address a number of bunkering dispute cases that demonstrate that federal district courts and circuit courts of appeal repeatedly have treated claims such as Wilhelmsen's as subject to admiralty jurisdiction, whether characterizing the intermediate entity as a "broker," "subcontractor," or something else. In at least two cases, courts not only held that admiralty jurisdiction was proper, but even held that the plaintiff "broker" (i.e., intermediate entity) was entitled to a maritime lien against the vessel to which the bunkers were supplied.

For example, in *Galehead, Inc. v. M/V ANGLIA*, 183 F.3d 1242 (11th Cir. 1999), the alignment of the parties was virtually identical to that of the parties in this proceeding. The charterer Genesis (equivalent to the U.S. government here) requested the efforts of Polygon (UBS here) to obtain fuel in Florida. *Id.* at 1244. Polygon contacted Asamar (Wilhelmsen here) to supply the fuel. *Id.* Asamar contracted with Coastal (Sumitomo here) to physically supply the bunkers to the vessel. *Id.* As in this case, the bunker confirmation listed Coastal as the physical supplier and Asamar as the seller. *Id.* Asamar paid Coastal (just as Wilhelmsen has paid Sumitomo); Asamar, however, was not paid (just as UBS has not paid Wilhelmsen). *Id.*

9

A second bunkering occurred with similar parties involved, with the exception that ChemOil and Marsh were the physical suppliers who supplied the vessel and were paid by Asamar, with Asamar once again not being paid. *Id.* A third bunkering occurred without Asamar's involvement, in which Polygon was listed as the seller and ChemOil and Tesoro were the physical suppliers. *Id.* Polygon paid ChemOil and Tesoro, but was not paid by Genesis. *Id.* All of Polygon and Asamar's claims were purchased by, and assigned to, Galehead. *Id.*

Galehead filed a complaint *in rem* against the vessel, alleging that it had maritime lien claims against the vessel based on Asamar's and Polygon's bunker claims. *Id.* Notably, the district court categorized both Asamar and Polygon as "fuel brokers" based on their intermediate status in the transaction. *See, e.g., Galehead, Inc. v. M/V ANGLIA*, 15 F. Supp. 2d 1304, 1307 (S.D. Fla. 1998) (stating "[w]hether fuel brokerage services give rise to maritime liens has been discussed extensively . . . ."). Applying admiralty law, the district court ruled that Polygon had a maritime lien claim against the vessel and Asamar did not. 183 F.3d at 1244. Galehead appealed the district court's decision. *Id.*

On appeal, the Eleventh Circuit affirmed the district court's decision in relevant part. *See id.* at 1247. The Eleventh Circuit made clear that both suppliers had claims subject to admiralty jurisdiction, however, Asamar's maritime claim did not qualify for a maritime lien claim because there was no showing that Asamar's work was performed "on the order of the owner or a person authorized by the owner":

> [T]o obtain a maritime lien, a person must: (1) provide necessaries; (2) to a vessel; (3) on the order of the owner or agent. While Polygon satisfies all three of the elements, *Asamar fails on element number three and does not qualify for its two liens.* So, Galehead is entitled to only one lien.
>
>         \*    \*    \*
>
> About the first element, *although Polygon did not physically supply the bunkers, a party need not be the physical supplier or deliverer to have "provided" necessaries under the statute. See The GOLDEN GATE* . . . , 52 F.2d 397, 400

(9th Cir. 1931); *A/S Dan-Bunkering Ltd. v. M/V ZAMET*, 945 F. Supp. 1576, 1578-79 (S.D. Ga. 1996). The bunkers were supplied pursuant to an agreement made between Genesis and Polygon. That agreement caused, or provided for, the delivery of the fuel to the vessel. Therefore, Polygon "provided" necessaries to the vessel under the contract irrespective of how, or by whom, the delivery was carried out. *See generally* Restatement (Second) of Contracts § 318 cmt. a, illus. 2 (1979) ("A contracts to deliver to B coal of specified kind and quality. A delegates the performance of this duty to C, who tenders to B coal of the specified kind and quality. The tender has the effect of a tender by A." ).

\* \* \*

The work done by Asamar was not "on the order of the owner or a person authorized by the owner." Therefore, Galehead is entitled to neither of the two potential liens arising from the August and September 1995 fuelings. Summary judgment was proper for Anglia here.

*That Asamar has met the first two elements of the statutory test is not much disputed.* But the third element is a problem for Asamar.

*Galehead*, 183 F.3d 1242, 1244-45 (11th Cir. 1999) (emphasis supplied).

The Eleventh Circuit's decision in *Galehead* is relevant because it expressly recognizes that Asamar must be deemed to have (1) provided necessaries (2) to a vessel. While these two elements do not alone entitle Asamar to a maritime lien, it is unquestionable that the satisfaction of those two elements qualifies the claim as a maritime claim warranting the use of Rule B. *See, e.g., Gulf Marine & Indus. Supplies, Inc. v. New Filipino Maritime Agencies, Inc.*, No. 01-0555, 2001 WL 277924 (E.D. La. Mar. 20, 2001) (holding plaintiff's Rule B attachment was proper because "the Court finds that the plaintiffs have satisfied the requirement of establishing that their claim is maritime in nature as it concerns the furnishing of necessaries to a vessel.").

Here, the factual similarities between Asamar's position and Wilhelmsen's position make the two claims virtually indistinguishable. Accordingly, following the Eleventh Circuit's *Galehead* decision, this Court should hold that Wilhelmsen's claim is a maritime claim and reject Defendants' argument that the Order of Attachment should be vacated for lack of admiralty jurisdiction.

11

The *Galehead* decision is only one of several precedents supporting Wilhelmsen's position that its claim is maritime in nature. In *Tramp Oil & Marine, Ltd. v. M/V MERMAID I*, 805 F.2d 42 (1st Cir. 1986), the court decided whether a "fuel broker" in an intermediate position was entitled to a maritime lien on the vessel. The court denied plaintiff's maritime lien claim, but its analysis suggested (similar to *Galehead*) that the plaintiff failed to prevail not because it lacked a maritime claim, but instead because it could not show that its maritime claim was entitled to lien status. *See*, *e.g.*, *id.* at 46 (suggesting that plaintiff could have secured an assignment of the physical suppliers' maritime lien to secure its claim); *accord Hampton Bermuda Ltd. v. M/V STAR SIRANGER*, No. H-05-3074, 2007 WL 677263 (S.D. Tex. Feb. 28, 2007) (analyzing intermediate plaintiff's maritime lien claims under admiralty law); *Lee v. M/V GEM OF MADRAS*, No. H-05-0631, 2006 WL 568545 (S.D. Tex. Mar. 6, 2006) (same).

In *A/S Dan-Bunkering Ltd. v. M/V ZAMET*, 945 F. Supp. 1576 (S.D. Ga. 1996), the plaintiff was an intermediate supplier who paid the local supplier for bunkering the vessel but was not paid in turn. *Id.* at 1577-78. The court held that the plaintiff was a provider of necessaries to the vessel despite not having physically supplied the vessel and despite never having had title to the bunkers. *See id.* at 1579. Furthermore, because the court held that the bunkering request was made by a party with imputed authority of the owner, plaintiff's maritime claim was entitled to a maritime lien. *Id.* (holding that "[plaintiff] therefore is entitled to a maritime lien under the [Commercial Instruments and Maritime Lien Act] just as it would have been had it physically delivered the fuel to the ship."); *see also The GOLDEN GATE*, 52 F.2d 397, 400 (9th Cir. 1931) (holding that plaintiff bunker supplier was entitled to a maritime lien despite not having physically provided the bunkers to the vessel and stating that "it is immaterial who made the delivery").

The decisions in *Trans-Tec Asia v. M/V HARMONY CONTAINER,* No. CV 04-1160, 2004 WL 3820556 (C.D. Cal. Dec. 28, 2004) (*Trans-Tec I*), *related case at* 435 F. Supp. 2d 1015 (C.D. Cal. 2005) (*Trans-Tec II*), provide another example of a federal court's exercise of admiralty jurisdiction with respect to a dispute arising from a factually-similar transaction.

In the *Trans-Tec* dispute, plaintiff Trans-Tec entered into contract to procure fuel bunkers for the defendant vessel's charterer. The charterer contacted Trans-Tec's physical supplier in Korea to obtain bunkers for the vessel. *See Trans-Tec II*, 435 F. Supp. 2d at 1019-21. In turn, the physical supplier communicated with Trans-Tec to obtain a price quote (including Trans-Tec's standard terms and conditions) for the requested bunkers. *See id.* The vessel was bunkered but Trans-Tec's invoice never was paid by the charterer. *See id.* at 1021. Trans-Tec arrested the vessel, claiming it had a maritime lien against the vessel based on the bunkers it had furnished to the vessel. *See id.* at 1017 & 1019-21.

The court confirms admiralty jurisdiction throughout the Trans-Tec decisions. *See Trans-Tec I*, 2004 WL 3820556, at *1 ("*In this admiralty case*, [Trans-Tec] asserts five causes of action . . . ." (emphasis added)); *Trans-Tec II*, 435 F. Supp. 2d at 1017 ("This *admiralty case* arises out of a dispute over unpaid bunkers." (emphasis added)). Particularly noteworthy is *Trans-Tec II*'s holding that "[t]he bunker contract was a maritime contract for the sale of goods," *Trans-Tec II*, 435 F. Supp. 2d at 1022-23, notwithstanding the opinion's focus on Trans-Tec's contractual obligations – *i.e.,* the "middleman" with respect to the bunkering agreement – rather than those of the physical supplier of the bunkers. Hence, the *Trans-Tec* decisions again support the conclusion that claims of a bunkers provider, whether those made by a physical supplier or by a middleman such as Wilhelmsen, are maritime claims subject to this Court's admiralty jurisdiction.

13

The precedents cited above show that there is no blanket prohibition against admiralty law governing claims by intermediate parties to a bunkering contract. UBS fails to cite even one case that so holds. Keeping in mind the Supreme Court's instruction that "[p]recedent and usage are helpful insofar as they exclude or include certain common types of contract," *Kossick*, 365 U.S. at 735, and its further caution not to focus on the status of the parties but rather the nature of the transaction, *Exxon*, 500 U.S. at 611-612, the jurisdictional question is reduced down to the following issue – does a contract for furnishing fuel to a vessel qualify as a maritime contract such that admiralty jurisdiction is proper? The *Exxon* Court answered this question unequivocally – it certainly does, regardless of whether the fuel is provided by the plaintiff directly or by a third party at the order of the plaintiff. *Id.* at 612-613. Accordingly, Defendants' argument that the UBS/Wilhelmsen contract is a brokerage contract that does not fall within admiralty jurisdiction should be rejected.

## C.    Wilhelmsen Was Not a Broker, the Agreements Were Not Otherwise "Preliminary" Contracts, and UBS's Other Arguments Do Not Apply In This Factual Scenario

### 1.    Wilhelmsen was not a broker

An even more fundamental reason exists for rejecting UBS' claim that Wilhelmsen was a broker and its claim was not maritime: *Wilhelmsen did not act as a broker in these transactions*.

The late Judge Casey's decision in *Sea Transport Contractors v. Industries Chimiques Du Senegal*, 411 F. Supp. 2d 386 (S.D.N.Y. 2006), is instructive in analyzing the relationship between the parties here. Plaintiff ("STC") was retained by defendant ("ICS") to act on ICS's behalf in managing various aspects of ICS's business related to shipping its cargo. *See id.* at 389. STC sued ICS for breach and commenced a Rule B proceeding in New York. *Id.* Similar to UBS here, ICS moved to vacate the attachment order on grounds that the STC/ICS contract was

14

not a maritime contract because it was a brokerage contract or, alternatively, it was a preliminary contract. *Id.* at 392. Judge Casey rejected ICS's broker argument on the very basis of the relationship that exists here. He ruled that the STC/ICS contract was not a brokerage contract because it called for STC creating separate, distinct tiered contracts between ICS and STC, because STC's profit on the contract would be based on freight differentials, and because STC's compensation would not be based on commissions. *Id.* at 394.

Judge Casey's analysis applies equally here. Satisfaction of Wilhelmsen's duties under the UBS/Wilhelmsen contract did not lead to a contract between UBS and Sumitomo, but rather a contract between UBS and Wilhelmsen and another between Wilhelmsen and Sumitomo. Like the freight differential profit to be earned by STC, Wilhelmsen's profit was based on differentials in the fuel sale price between the two contracts. Wilhelmsen has paid Sumitomo directly for Sumitomo's provision of the bunkers to the nominated vessels. A broker has no obligation to pay on behalf of its principal in a broker's contract. Instead, the principal pays for the services obtained by the broker and the broker receives its commission from the principal. None of these indicia are characteristic of a brokerage agreement. Furthermore, UBS concedes that two separate contracts are present here back-to-back rather than one between UBS and Sumitomo on which Wilhelmsen acted as a broker. Perhaps most significantly, UBS notified Wilhelmsen of a potential contamination claim and has reserved its right before this Court to seek counter-security from Wilhelmsen. Such a claim would not properly be made against a broker which procures a supply contract with a third party. It would be proper, however, against a party which has undertaken the obligation to supply conforming fuel to a nominated vessel.

UBS has characterized the primary benefit it obtained in the UBS/Wilhelmsen contract as the financial credit terms that contracting with Wilhelmsen brought. This contention does not

15

reflect the law; a court in this district (in the remand of the *Exxon* case) has ruled expressly opposite to this argument. *See Exxon Corp. v. Central Gulf Lines, Inc.*, 780 F. Supp. 191, 194 (S.D.N.Y. 1991) (holding that "[t]he furnishing of credit constitutes the furnishing of a necessary under the Lien Act.") (citing *Universal Shipping, Inc. v. Panamanian Flag Barge*, 563 F.2d 483 (1st Cir. 1976)). UBS's contention also fails on the facts, as the principal objective of the UBS/Wilhelmsen contract, as defined by the incorporated Sumitomo Terms, is Wilhelmsen's obligation to supply fuel to nominated vessels. *Exxon*, 500 U.S. at 612-13 ("The subject matter of the Jeddah claim, like the New York claim, is the value of the fuel received by the ship.").

Furthermore, in addition to the bunkers themselves, UBS received the expertise provided by Wilhelmsen in the logistics, planning, industry contacts, knowledge of fuel classifications and requirements of particular vessels. Wilhelmsen's advantage over its competitors by the availability of credit terms was not the primary purpose of the UBS/Wilhelmsen contract. It was not even an explicit term of that contract. The Second Circuit recently made clear that incidental non-maritime components are immaterial to admiralty jurisdiction where a contract's principal objective is maritime commerce. *Folksamerica*, 413 F.3d at 315. Under *Kirby* and *Folksamerica*, UBS cannot use an incidental financing benefit provided by Wilhelmsen to remove a bunkering agreement from this Court's admiralty jurisdiction.

2.    The UBS/Wilhelmsen contract was not a "preliminary" contract

UBS also argues that the UBS/Wilhelmsen contracts were "preliminary" and outside admiralty jurisdiction. Judge Casey's *Sea Transport Contractors* decision explains why UBS's contention is mistaken, as preliminary contracts do not bind the performing party to perform functions related to maritime commerce, but rather merely are contracts where the performing party seeks to procure third parties to engage in activities related to maritime commerce:

16

> Nor is the [STC/ICS] Contract otherwise "preliminary." ICS argues that the [STC/ICS] Contract "is an agreement to procure contracts for the use of another's vessels" . . ., but this is not the case. First, the contract <u>presently</u> binds ICS to use STC as exclusive handler of ICS shipping needs [and other shipping functions] . . . . Second, it is no mere technical difference to say that this is a contract "<u>to</u> procure contracts" as opposed to a contract that contemplates or authorizes entry into other contracts. Were it the former, it would be preliminary for its <u>object</u> would be satisfied by entry into the future contract. *But STC's entry into future charter parties does not satisfy the terms of the [STC/ICS] Contract. Indeed, one can imagine numerous situations where subsequent contracts and performance on or breach of those contracts would violate the terms of the [STC/ICS] Contract, including specific shipments of, or failures to ship, cargo.*

*Sea Transport Contractors*, 411 F. Supp. 2d at 394 (underlined emphasis in original) (italicized emphasis added). As discussed earlier, the UBS/Wilhelmsen agreements bound Wilhelmsen to bunker the nominated vessels. It could satisfy that obligation by hiring a sub-contractor (such as Sumitomo) to carry out the physical supply function. In the event that Sumitomo was unable to perform, however, Wilhelmsen's procurement of Sumitomo as a physical supplier did not satisfy its obligations under the UBS/Wilhelmsen agreements. Rather, Wilhelmsen would have been compelled to procure a substitute physical supplier or be found in breach its contract with UBS. This is the precise situation of which the emphasized portion of the excerpt from Judge Casey's decision above speaks; there is nothing "preliminary" about the UBS/Wilhelmsen agreements.

Wilhelmsen does not dispute that it acts as a fuels broker on numerous occasions in various transactions worldwide. But in the agreements with UBS, Wilhelmsen's transactions were organized in a two-tier, back-to-back contract format rather than in the form of a single contract with Wilhelmsen being paid as a broker for UBS. Just as Judge Casey rejected ICS's argument that STC acted as a broker in the *Sea Transport Contractors* case, the very nature of the two-tiered contracts – which contracts are conceded by UBS – requires this Court to reject UBS's contentions that Wilhelmsen acted as a broker in this transaction or that the UBS/Wilhelmsen agreements were "preliminary" contracts.

3.    UBS's other arguments against admiralty jurisdiction

UBS argues that this dispute does not require a neutral federal forum. This contention relates to a "threshold inquiry" test that the Second Circuit used to employ; which inquiry the Second Circuit's *Folksamerica* decision expressed doubt as to whether it survived the Supreme Court's recent *Kirby* decision. *Folksamerica*, 413 F.3d at 313. The Second Circuit used the "threshold inquiry" twice to reject admiralty jurisdiction where a connection with maritime commerce was too speculative and attenuated. *Id.* at 312. In light of the *Folksamerica* decision and the *Exxon* decision's commentary on bunkering claims' connection with maritime commerce, UBS's nuetral federal forum argument should be rejected out of hand.

UBS also seeks to analogize finance contracts or guarantees of maritime contracts to the agreements at issue here. UBS's citation to these cases to support its position reflects a misunderstanding in the difference between the two types of guarantees: guarantees of payment (which are not subject to admiralty jurisdiction) and guarantees of performance, which most certainly are maritime contracts. *See, e.g., Japan Line, Ltd. v. Willco Oil Ltd.*, 424 F. Supp. 1092, 1094-95 (D. Conn. 1976) (citing cases). Therefore, UBS's analogy to these types of cases simply does not withstand the application of the facts of this dispute.

## POINT II

### WILHELMSEN HAS ADEQUATELY STATED A *PRIMA FACIE* ADMIRALTY CLAIM AGAINST RAECORP, THEREBY SATISFYING WILHELMSEN'S BURDEN UNDER THE RULE E(4)(f) INQUIRY

**A.    Plaintiff Has Satisfied Its Burden of Alleging a "*Prima Facie* Admiralty Claim"**

In *Aqua Stoli*, this Circuit emphasized that "Rule B specifies the sum total of what must be shown for a valid maritime attachment." 460 F.3d at 447. As noted in *Tide Line Inc., v. Eastrade Commodities Inc.,* No. 06 Civ. 1979, 2006 WL 4459297, 2007 A.M.C. 252 (S.D.N.Y.

18

2007), the *Aqua Stoli* court "rejected the approach taken by the district court in *Royal Swan Navigation Co. v. Global Container Lines, Ltd*, 868 F. Supp. 599 (S.D.N.Y. 1994), which would impose a fact intensive inquiry...before deciding whether an attachment should be vacated." *Id.* at 257 (citation omitted).  Thus, Judge Wood concluded that the "sum total" language in *Aqua Stoli* implies that the "reasonable grounds" standard is too exacting, exceeding the limited inquiry set out by Congress in Rule B and Rule E(4)(f).

Judge Wood is not alone in this interpretation; almost every district court opinion that has considered the issue of Rule B attachment burdens post-*Aqua Stoli* has come to a similar conclusion.  *See, e.g., Dolco Investments Ltd., v. Moonriver Dev., GML*, No. 06 Civ. 12876, 2007 WL 1237997, at *1, 4 (S.D.N.Y Apr. 26, 2007) (agreeing with the "weight of authority" and applying the *prima facie*, pleadings-based standard because it more closely comports with the Second Circuit's rejection of the "broader Rule E(4)(f) inquiry" that the reasonable grounds test would necessarily include); *SPL Shipping, Ltd. v Gujarat Cheminex*, No. 06 Civ. 15375, 2007 WL 831810, at *4 (S.D.N.Y. Mar. 15, 2007) (holding that the plaintiff's [adequately stated] pleadings are sufficient to resist vacatur of the attachment); *Fesco Ocean Mgmt v. High Seas Shipping*, No. 06 Civ. 1055, 2007 WL 766115, at *2 (S.D.N.Y. Mar. 12, 2007).  Under the *prima facie* admiralty claim test, the court looks to the plaintiff's complaint to ascertain whether the plaintiff has alleged a valid admiralty claim. *SPL Shipping*, 2007 WL 831810, at *3.

Wilhelmsen's Amended Verified Complaint satisfies this threshold standard by alleging the following alter ego allegations against Raecorp:

- RaeCorp is the alter ego of, and/or successor to, USS-UBS.  Alternatively, RaeCorp so dominates USS-UBS that this Court should disregard the corporate veils between the defendants.
- USS-UBS and RaeCorp both have the same sole director, Mr. William Rae.

- USS-UBS and RaeCorp have the same address: Unit 2, 50 Borthwick Avenue, Murarrie, QLD 4172, Australia.
- USS-UBS and RaeCorp have the same telephone number: +61 7 3902 0800.
- USS-UBS use the same web address for their website. RaeCorp's website is listed on Mr. Rae's correspondence as www.raecorpint.com. When that weblink is accessed, the web user is transferred to the http://www.ubsprov.com.au/ home page, which is the web homepage for USS-UBS.
- Mr. Rae responds to correspondence related to USS-UBS with a RaeCorp e-mail suffix (billrae@raecorpint.com) and he uses the terms RaeCorp and USS-UBS interchangeably in corporate advertising literature (e.g., "All sales are made in accordance with Raecorp's (USS-UBS Int's) General Terms and Conditions, which are available on request").

Amended Verified Complaint, ¶¶ 11-16.

Furthermore, after Raecorp was added as a defendant, a payment made by Raecorp to Defendants' counsel was intercepted at Bank of America. That payment was made by Raecorp to pay UBS's outstanding legal invoices with its counsel. Frevola Aff., Ex. 4, Transcript Page 12.

Federal common law governs the issue of piercing the corporate veil in admiralty actions and, thus, whether Wilhelmsen has stated a claim against Raecorp. *See*, *e.g.*, *Dow Chem. Pac. Ltd. v. Rascator Maritime S.A.*, 782 F.2d 329, 342 (2d Cir. 1986) (citations omitted). Under federal common law, piercing the corporate veil is appropriate in two circumstances:

> The individual [or corporate parent] must have used the corporate entity to "perpetuate a fraud or have so dominated and disregarded" the corporate entity's form that the entity "primarily transacted [the individual's or parent's] business rather than its own corporate business."

*Id.* (quoting district Court decision) (citations omitted). Thus, proving fraud is not essential to piercing the corporate veil. *Northern Tankers (Cyprus) Ltd. v. Adam Backstrom*, 967 F. Supp. 1391, 1399-1401 (D. Conn. 1997). It does, however, provide an additional basis for piercing the

corporate veil.  Aside from fraud/inequity, a plaintiff can pierce a corporate veil by showing that a person or corporation exercises dominion and control over its alter ego.

Several local district courts recently have applied the *prima facie* admiralty claim standard to veil-piercing in the context of Rule B attachments.  In *SPL Shipping v. Gujarat*, defendant Nirma Ltd. sought to vacate a Rule B order of Maritime Attachment pursuant to Rule E(4)(f) obtained by plaintiff SPL on an alter-ego theory of liability.  2007 WL 831810, at *1.  In that case, Nirma, a limited liability company, made a payment to SPL against a freight certificate attendant to a charter party agreement between SPL and Gujarat to which Nirma was not a party. *Id.*  Judge Karas based his decision finding that SPL had stated a valid admiralty claim against Nirma on the theory of alter ego liability and denying the vacatur motion on the following:

> Plaintiff has essentially made three allegations against Nirma:  first, that Nirma has in this case, and in other cases, made payments on behalf of Gujarat to third parties; second, that "there existed such unity of ownership and interest… that no separation exists between" Nirma and Gujarat, such that the "corporate form has been disregarded"; and third, that Nirma has "dominated and used" Gujarat "for their own purposes such that there is no meaningful difference between the three entities and there has been an intermingling of funds between the several entities".

2007 WL 831810 at *4.

Using this same pleadings-based standard for determination, Judge Buchwald upheld a maritime attachment based on alter ego liability and denied defendants' motion for vacatur in *Fesco Ocean Management v. High Seas Shipping*, 2007 WL 766115 at *4.  In *Fesco*, the allegations upon which Judge Buchwald relied to uphold the attachment were that "United" was merely a shell corporation of "High Seas," employed solely to hold or transfer money on behalf of High Seas, so as to defraud hinder or delay creditors of High Seas and make payments on behalf of High Seas.  2007 WL 766115, at *3.

The foregoing decisions show that Wilhelmsen's burden at this stage is minimal, whether that burden is defined by the *prima facie* admiralty claim standard or by the reasonable grounds standard. In *Ullises Shipping Corp. v. Fal Shipping Co.*, 415 F. Supp. 2d 318 (S.D.N.Y. 2006), Plaintiff sustained its burden merely by showing that the alter ego had paid one invoice of the primary defendant. In *A. Coker & Co. v. Nat'l Shipping Agency*, No. 99-1440, 1999 WL 371941 (E.D.La. May 17, 1999), it was met by showing insufficient capitalization, the alter ego's guarantee of the primary defendant, and that the two companies *may* have shared offices. Wilhelmsen has shown Raecorp's payment of a UBS invoice; it likewise has submitted documentation to this Court showing common addresses, common telephone numbers, common principals, intermingled advertising and e-mail addresses. UBS's counsel's admissions at the recent scheduling conference indicate that UBS is insufficiently capitalized.

Even if this Court were to apply the more stringent "reasonable grounds" test suggested by Defendants, "plaintiffs . . . should not be required to prove their case" at the Rule E(4)(f) hearing stage. *Wajilam Exp. (Singapore) Pte Ltd. v. ATL Shipping Ltd.*, 475 F. Supp. 2d 275, 279 (S.D.N.Y. 2006). Rather, the hearing is only for the purpose of determining whether there were reasonable grounds for the issuance of the *ex parte* order for the process of maritime attachment and garnishment. *Salazar v. The ATLANTIC SUN*, 881 F.2d 73, 79-80 (3d Cir. 1989); *Maersk, Inc. v. Neewra, Inc.*, No. 05 Civ. 4356 (RCC), 2006 WL 2168452, at *10 (S.D.N.Y. Aug. 1, 2006); *Ullises Shipping Corp.*, 415 F. Supp. 2d at 326. Courts inquiring further merely review the limited evidence present – taking into account the short turn around time involved with a Rule E(4)(f) hearing – and determine whether plaintiff *may be able to prove its contentions*. *Maersk*, 2006 WL 2168452, at *10; *Linea Naviera Carbotrade v. Mar Caribe De Navegacion*, 169 F. Supp. 2d 1341, 1359-60 (M.D. Fla. 2001).

In *Ullises Shipping*, Judge Scheindlin held that one payment of a charter hire invoice of the principal defendant by an alleged alter-ego was sufficient grounds to maintain the attachment over the alleged alter-ego, despite both Defendants having shown hundreds of millions of dollars of capitalization, separate corporate filings, affidavits supporting corporate separateness, and similar evidence. In upholding the multi-million dollar attachment over the alleged alter-ego because of the payment made on behalf of the corporate affiliate, Judge Scheindlin ruled:

> *Although this is not conclusive evidence, [plaintiff] has met its burden of showing reasonable grounds for attaching the assets [of the alter ego defendant].*

*Ullises Shipping Corp.*, 415 F. Supp. 2d at 326 (emphasis added). Here, Raecorp was paying UBS's legal bills when that payment was intercepted by the attachment order. Like *Ullises*, this payment satisfies the inquiry an should cause the alter ego attachment to be sustained.

Other district courts have used similar grounds to maintain maritime attachments in cases similar to the case at bar. In *A. Coker & Co. v. Nat'l Shipping Agency Corp.*, No. 99-1440, 1999 WL 311941, at *2 (E.D. La. May 17, 1999), plaintiff produced a document showing that the alleged alter egos were affiliates, that the principal defendant had insufficient capital to perform its obligations under the charter party, and that the alleged alter ego guaranteed the primary defendant's performance. Plaintiff also showed that the alter ego *might* have been acting as a conduit for NSAC. On this basis, the court upheld the attachment against the alter ego, stating:

> *[Plaintiff] has not definitively established that Summit Marine and NSAC are alter egos. At this preliminary stage, however, [plaintiff] need only show probable cause. [Plaintiff] has met this burden.*

*Id.* at *2 (emphasis added).

The *Linea Naviera* court used similar reasoning:

> While characterizing [plaintiff's] evidence as *not conclusive*, and recognizing that the decision to continue the attachments was not a final determination of

23

commonality and control between the three entities, *Judge Corrigan [properly] concluded that the attachment was supported by probable cause.*

*Linea Naviera Carbotrade v. Mar Caribe De Navegacion*, 169 F. Supp. 2d 1341, 1359-60 (M.D. Fla. 2001) (emphasis added). Using either standard, Wilhelmsen's burden to maintain the attachment order against Raecorp does not require abundant proof, but rather indicia that Wilhelmsen may be able to show that UBS and the newly created Raecorp are alter egos.

Perhaps most significantly, however, Mr. Rae's affirmation does not even seek to controvert Wilhelmsen's alter ego allegations. For these reasons, this Court should reject Raecorp's contention that the attachment order against it should be vacated.

## POINT III

## THE ELECTRONIC FUND TRANSFERS THAT HAVE BEEN ATTACHED ARE "PROPERTY" UNDER THE LAW OF THIS CIRCUIT

Defendants argue this Court should not follow *Winter Storm Shipping Ltd. v. TPI*, 310 F.3d 263 (2d Cir. 2002) or limit it similar to Judge Rakoff's decision in *Seamar Shipping Corp. v. Kremikovtzi Trade Ltd.*, 461 F. Supp. 2d 222 (S.D.N.Y. 2006). This Court addressed this issue at the scheduling conference. *See* Frevola Aff., Ex. 4, Transcript Page 10 ("There is no split. Electronic fund transfers in this circuit are attachable under *Winter Storm*, and *Aqua Stoli* does not change that.") In the interests of space limitations, Wilhelmsen will not recite the numerous recent district court decisions in this district which support the Court's holding on this issue.

## POINT IV

## INTERLOCUTORY APPEAL IS NOT WARRANTED

Defendants contend that interlocutory appeal is warranted because (1) vacating the attachment would terminate the case because Wilhelmsen contends that the dispute is subject to London arbitration; and (2) a substantial ground for difference of opinion exists. As for

Defendants' first contention, Wilhelmsen has not demanded arbitration and intends to proceed on the merits in New York. On the second issue, this Court is aware of the multitude of recent decisions in this district which have decided this issue just as this Court has indicated it will. There is only one decision, *Seamar*, which has broken ranks, and it has been roundly rejected. *See, e.g., Compania Sudamericana de Vapores S.A. v. Sinochem Tianjin Co.*, No. 06 Civ. 13765 (WHP), 2007 WL 1002265, at *4 (S.D.N.Y. Apr. 4, 2007) (comparing sole *Seamar* decision to multitude of decisions following *Winter Storm*). Further, Judge Pauley's analysis denying the application for interlocutory appeal in *Compania Sudamericana* likewise applies here, and this Court should reject Defendants' request for certification for interlocutory appeal. *Id.* at *5.

## CONCLUSION

Because Wilhelmsen's agreements with UBS are maritime contracts subject to admiralty jurisdiction, because it has pled a *prima facie* admiralty claim against Raecorp, because it has attached UBS's property in this jurisdiction, and because UBS has not shown the extraordinary circumstances necessary to warrant a grant of certification for interlocutory appeal, this Court should deny Defendants' motion in its entirety.

Dated: New York, New York
      September 20, 2007

                                HOLLAND & KNIGHT LLP

By:    _____
                    William J. Honan (WJH 1922)
                    Michael J. Frevola (MJF 8359)
                    195 Broadway
                    New York, NY 10007-3189
                    Tel:   (212) 513-3200
                    Fax:  (212) 385-9010

                    *Attorneys for Plaintiff*
                    *Wilhelmsen Premier Marine Fuels AS*