UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____x

WILHELMSEN PREMIER MARINE FUELS AS,

             Plaintiff,

-against-   07 CV 5798 (CM)

UBS PROVEDORES PTY LTD. a/k/a
USS-UBS INTERNATIONAL and
RAECORP INTERNATIONAL PTY LTD.,

             Defendants.
_____x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/1/07

### DECISION AND ORDER DENYING DEFENDANTS' MOTION TO VACATE THE MARITIME ATTACHMENT

McMahon, J.:

Defendants, UBS Provedores Pty. Ltd. ("UBS") and Raccorp International Pty. Ltd. ("Raccorp"), move to (1) to vacate the *ex parte* orders directing the Clerk to issue Process of Maritime Attachment and Garnishment against UBS and Raccorp and the Processes of Maritime Attachment and Garnishment obtained and served by Plaintiff Wilhelmsen Premier Marine Fuels AS ("Wilhelmsen" and/or "Plaintiff") thereunder, pursuant to Fed. R. Civ. P., Supp. Adm. R. B & E(4)(f); or, in the alternative, to (2) certify an interlocutory appeal of this motion, pursuant to 28 U.S.C. § 1292(b). Defendants' argument is that the UBS/Wilhelmsen contract is not maritime and Wilhelmsen's allegations against Raccorp are legally insufficient to support a Rule B attachment.

The parties have submitted memoranda in support of their positions and a hearing was held on September 26, 2007, pursuant to pursuant to Fed. R. Civ. P., Supp. Adm. R. E(4)(f). For the reasons discussed below, the defendant's motion to vacate the order of attachment is denied.

## Background

Wilhelmsen is a company organized under the laws of Norway, with a place of business in Lysaker, Norway. (*See* Amended Complaint, ¶ 2). Wilhelmsen acts as both a broker and a supplier of bunkers to seagoing vessels at a variety of ports worldwide. Affirmation of Hans Borge ("Borge Aff."), ¶ 3.

UBS is a company organized under the laws of Australia, with a place of business located at Unit 2, 50 Bothwick Avenue, Murarrie, QLD 4172, Australia. UBS is in the business of provisioning military entities including the provision of marine fuel oil to military vessels. (Declaration of William Rae, dated September 13, 2007, at ¶ 2 ("Rae Dec")).

Defendant RaeCorp International Pty. Ltd. ("RaeCorp) is a business entity organized under the laws of Australia, with its principal place of business located at Unit 2, 50 Bothwick Avenue, Murarrie, QLD 4172, Australia. (*See* Amended Complaint, ¶ 5).

On September 21, 2006, UBS entered into a marine fuel oil requirements contract with the U.S. Defense Energy Support Center ("US Navy") to provide bunker fuel to various U.S. military and federal civilian vessels at various ports throughout Asia ("DESC Contract"). Rae Decl., ¶¶ 5 and 6. UBS then entered into a series of agreements with Wilhelmsen, wherein Wilhelmsen would provide vessels nominated by UBS with bunkers[1] in the ports of Sasebo and Naha in Japan. Affirmation of Hans Borge ("Borge Aff."), ¶ 4. Each time that UBS contacted Wilhelmsen to bunker a nominated vessel, Wilhelmsen confirmed the terms of that agreement and stated that "delivery will

---

[1] A veritable landlubber, this Court has had to educate itself in maritime jargon. For instance, "to provide vessels nominated by UBS with bunkers," means that vessels designated in a contract were to be provided with marine fuel oil– fuel oil to propel the ship, not oil to be carried in the ships hold as cargo. The Court assumes that the reader is at least casually acquainted with maritime speak.

2

be made in accordance with supplier's [Sumitomo Corporation Europe Ltd. ("Sumitomo")] terms and conditions. *Id.* ¶ 5 & Exs. 2, 3. In accepting UBS's nominations, Wilhelmsen undertook to bunker the nominated vessel under the Sumitomo terms, and it would be responsible to UBS for a failure to bunker a vessel in the specified Japanese port at the designated time. *Id.* ¶ 6.

Wilhelmsen did not use its own employees and services to physically supply the bunkers that were requested by UBS for the nominated vessel. *Id.* ¶ 7. Instead, as is apparently common in the bunkering industry, Wilhelmsen used a local supplier to physically supply the vessel in accordance with its instructions. *Id.* In doing so, Wilhelmsen contracted with a local supplier, Sumitomo, to carry out the requested bunkering operations. *Id.*; *see also* Affirmation of Alan Hillgrove ("Hillgrove Aff."), ¶ 4. On ten separate occasions, Wilhelmsen performed under its contract with UBS by purchasing bunkers from Sumitomo and ordering it to bunker the nominated vessel. Borge Aff., ¶ 4(a)-(j); Hillgrove Aff., ¶ 3(a)-(j). Wilhelmsen apparently paid Sumitomo for each of the ten nominations. Borge Aff., ¶ 8; Hillgrove Aff., ¶¶ 4(a)-(j), 6 & Ex. 1. However, Wilhelmsen claims it has not been paid by UBS. Borge Aff., ¶ 10.

For its part, UBS admits that it has not paid Wilhelmsen for the ten bunkerings in question. However, UBS claims that the reason it has not been paid by the U.S. Government for the bunkerings is because Wilhelmsen failed to produce substantiating documentation. Rae Decl ¶ 7. There is nothing in the record to support UBS assertion that it had not been paid. To the contrary, documentation from both DESC and Military Sealift Command indicate that UBS has been paid in full for the Wilhelmsen bunkerings. *See id.*, ¶¶ 5-7; Borge Aff., ¶ 13 & Ex. 7.

Wilhelmsen has successfully attached electronic fund transfers ("EFTs") to and from UBS and Raecorp while they passed through New York banks. UBS and Raecorp claim that they did not

3

have a property interest in those EFTs, and they were, therefore, not subject to attachment under Rule B. UBS's also claims that those EFTs are not subject to maritime attachment because plaintiff had not yet commenced an underlying action.

### EFTs are Subject to Maritime Attachment and Plaintiff's Action is not Premature

Two of defendant's threshold arguments can be dispatched in short order.

The Court rejects plaintiff's argument that Electronic Funds Transfers are not subject to maritime attachment. "Under the laws of this circuit, EFTs to or from a party are subject to a maritime attachment by a court as they pass through banks located in that court's jurisdiction." *Aqui Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.2d 434 at 436 (2d Cir. 2006) (citing *Winter Storm Shipping Ltd. v. TPI*, 310 F.3d 263 (2d Cir. 2002)). In *Aqua Stoli*, the Second Circuit dropped a footnote questioning the correctness of the *Winter Storm* decision. *Id.* at 446 n.6. However, *Aqua Stoli* did not overrule *Winter Storm*; indeed it "can only be read to reaffirm *Winter Storm* as the law of this circuit." *Maersk, Inc. v. Neewra, Inc.*, 2006 U.S. Dist. LEXIS 73096, at *2 (S.D.N.Y Oct. 6, 2006); *see also Consub Delaware LLC v. Schahin Engenharia Limitada*, 476 F. Supp. 2d 305, 311 (S.D.N.Y. 2007) ("Despite the fact that the Second Circuit—in dicta—questioned the correctness of *Winter Storm*, it did not overrule *Winter Storm*.").

The Court also rejects defendants' argument that plaintiff's motion for a maritime attachment is premature because plaintiff has yet to commence an action to litigate the underlying claims. In maritime attachment cases (not based upon a claim for contingent indemnity), courts allow a plaintiff to apply for an attachment in contemplation of litigation. *See AET Inc., Ltd. v. Procuradoria De Servicios Maritimos Cardoso & Fonesca*, 464 F. Supp. 2d 241 (S.D.N.Y. 2006); *World Reach Shipping Ltd. v. Indus. Carriers Inc.*, No. 06 Civ. 3756 (NRB), 2006 WL 3316828 (S.D.N.Y. Nov.

9, 2006). Notwithstanding the statement on the last page of Wilhelmsen's brief that "it has not demanded arbitration and intends to proceed on the merits in New York" (Wilhelmsen Br. at 24-25),[2] it is enough that plaintiff contemplated litigation in London at the time the attachment was sought. The action was not premature.

That said, this Court will not hesitate to lift the attachment after a reasonable time if Wilhelmsen fails to initiate litigation on the merits somewhere.

### Standards for Maritime Attachment and Vacatur

To obtain a maritime attachment, a plaintiff must satisfy the requirements of Supplemental Rule B, which states in relevant part:

> If a defendant is not found within the district ... a verified complaint may contain a prayer for process to attach the defendant's tangible or intangible personal property-- up to the amount sued for--in the hands of garnishees named on the process .... The court must review the complaint and affidavit and, if the conditions of this Rule B appear to exist, enter an order so stating and authorizing process of attachment and garnishment. The clerk may issue supplemental process enforcing the court's order upon application without further court order.

Fed. R. Civ. P. Supp. R. B(1)(a)-(b).

Rule E(4)(f) entitles any person whose property has been attached pursuant to Supplemental Rule B the opportunity for a "prompt hearing at which plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules." Fed. R. Civ. P. Supp. R. E(4)(f). The plaintiff has the initial burden to show that its attachment satisfies the requirements of Supplemental Rules B and E. *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty.*

---

[2] It is not altogether clear how Wilhelmsen might do so, and UBS has indicated that if Wilhelmsen tries to litigate the merits here in New York on a *quasi in rem* theory, it will move to dismiss on *fourum non-conveniens* grounds– a motion that, at first blush, would seem to have considerable merits.

*Ltd.*, 460 F. Supp. 434, 445 n. 5 (2d Cir. 2006). In order to sustain an attachment, a plaintiff must prove that it has satisfied the "filing and service requirements of Rules B and E" and that: (1) it has a valid prima facie admiralty claim against the defendant, (2) the defendant is not present in the district, (3) defendant's property can be found within the district, and (4) there is no maritime law or statutory bar to the attachment. *Aqua Stoli*, 460 F.3d at 445. However, "maritime plaintiffs are not required to prove their case at this stage." *SPL Shipping Ltd. v. Gujarate Cheminex Ltd.*, No. 06-CV-15375(KMK), 2007 WL 831810, slip op. at *2 (S.D.N.Y. March 15, 2007).

In the present case, UBS claims the UBS/Wilhelmsen contract is not a maritime contract. Defining whether a contract is subject to admiralty jurisdiction requires a conceptual approach rather than a spatial approach. *Norfolk S. Ry. Co. v. James N. Kirby, Pty Ltd.*, 543 U.S. 14, 23 (2004) (citation omitted); *accord Folksamerica Reins. Co. v. Clean Water of N.Y., Inc.*, 413 F.3d 307, 311 (2d Cir. 2005). As facts vary case by case, great importance is placed in resolving this jurisdictional question on how such contracts have been treated in the past. *Folksamerica*, 413 F.3d at 311 (noting the Supreme Court's "instruct[ion] that '[p]recedent and usage are helpful insofar as they exclude or include certain common types of contract'") (quoting *Kossick v. United Fruit Co.*, 365 U.S. 731, 735 (1961)).

In analyzing whether a contract is subject to admiralty jurisdiction, courts are required to "look to the contract's "nature and character" to see 'whether it has 'reference to maritime service or maritime transactions.'" *Id.* (quoting *Kirby*, 543 U.S. at 24 (quoting *N. Pac. S.S. Co. v. Hall Bros. Marine Ry. & Shipbuilding Co.*, 249 U.S. 119, 125 (1919)) and citing *New England Mut. Marine Ins. Co. v. Dunham*, 78 U.S. 1, 26 (1870))).

### Wilhelmsen's Claim Against UBS

The underlying transaction for which all parties were retained – UBS, Wilhelmsen, and Sumitomo – was to bunker United States Navy and civilian vessels. In *Exxon Corp. v. Central Gulf Lines, Inc.*, 500 U.S. 603 (1991), the Supreme Court analyzed a fuel requirements contract similar to the UBS/DESC contract here. Exxon directly supplied bunkers to vessels in certain ports (New York), but subcontracted the physical supply function to local suppliers in ports where Exxon did not have the capability (Jeddah, Saudi Arabia was involved in the dispute). *Id.* at 605.

Exxon brought its claims in the Southern District of New York under the court's admiralty jurisdiction. The district court held that "preliminary contracts" and "agency contracts" fell outside the court's admiralty jurisdiction, rejected Exxon's contention that its claims for the Jeddah bunkering services fell within admiralty jurisdiction. *Id.* at 607. The Second Circuit affirmed the district court, for the reasons given in both the district court's original decision and in its further decision on reconsideration. Id.

On appeal, the Supreme Court overruled the "*per se* exception" to admiralty jurisdiction in the context of agency contracts and held that Exxon's claims based on the Jeddah bunkering services were subject to admiralty jurisdiction. Justice Marshall, writing for a unanimous Court, overruled the exception created by *Minturn v. Maynard*, 58 U.S. (17 How.) 477 (1854), because using a bright line rule to exclude contracts regardless of subject matter *based on the status of the claimant* was not consistent with the Constitution's grant of federal admiralty jurisdiction:

> Finally, the proposition for which *Minturn* stands – a *per se* bar of agency contracts from admiralty – ill serves the purpose of the grant of admiralty jurisdiction. As noted, the admiralty jurisdiction is designed to protect maritime commerce. [citation omitted]. There is nothing in the nature of an agency relationship that necessarily

7

> excludes such relationships from the realm of maritime commerce. Rubrics such as "general agent" and "special agent" reveal nothing about whether the services actually performed pursuant to a contract are maritime in nature. *It is inappropriate, therefore, to focus on the status of a claimant to determine whether admiralty jurisdiction exists.*

*Exxon*, 500 U.S. at 611-612 (emphasis added).

Turning to the subject matter of the dispute before the Court, the *Exxon* Court focused on whether Exxon's delivery of fuel in Jeddah through a local physical supplier (rather then itself) constituted a maritime transaction:

> In this case, the only difference between the New York delivery over which the District Court asserted jurisdiction, *see* n. 2, *supra*, and the Jeddah delivery was that, in Jeddah, Exxon bought the fuels from a third party and had the third party deliver them to the *Hooper*. The subject matter of the Jeddah claim, like the New York claim, is the value of the fuel received by the ship. *Because the nature and subject-matter of the two transactions are the same as they relate to maritime commerce, if admiralty jurisdiction extends to one, it must extend to the other.*

Id. at 612-613 (emphasis added).

Here, similar to the *Exxon* case, UBS contracted with Wilhelmsen to carry out the supplying of fuel to the vessels. Wilhelmsen entered into a similar transaction by transaction agreements with UBS for bunkering U.S. government vessels in Japan. By agreeing to supply those vessels, Wilhelmsen obligated itself to physically fuel the vessels itself or to find a local supplier from which to purchase fuel to carry out its contractual obligations to UBS. The correspondence from Wilhelmsen to UBS in which UBS's vessel nomination was confirmed always referenced Sumitomo's Terms and Conditions as applying to the UBS/Wilhelmsen transaction. The Sumitomo Terms make clear that Wilhelmsen contracted with UBS to fuel the designated vessels, and that

8

Wilhelmsen would be liable to UBS for a failure to do so. The subject matter of the UBS/Wilhelmsen contracts was to fuel the vessels nominated by UBS in accordance with the Sumitomo Terms. Wilhelmsen could bunker the vessels itself, or it could choose to subcontract that obligation to a local supplier. In either case, the *Exxon* Court made clear that Wilhelmsen's contract with UBS is a maritime contract regardless of whether Wilhelmsen performed the bunkering itself or contracted out the performance of that obligation. The UBS/Wilhelmsen agreements are classic maritime contracts for the provision of necessaries to a vessel.

The only difference between the facts before this court and the facts in Exxon is that the Exxon bunkering transaction was a three-way transaction – Exxon contracted with Waterman Steamship Corporation to bunker vessels and then turned to Arabian Marine Operating Company to supply the fuel – whereas in the case as bar, we have a four-party transaction – the Navy (the ship owner) contracts with UBS, which in turn hires Wilhelmsen, which in turn contracts with Sumitomo (the actual supplier of fuel). UBS argues that this makes Wilhelmsen's role in the transactions that of a bunker broker. Since brokerage contracts are not considered maritime contracts, Wilhelmsen contends that the attachment must be vacated.

I reject the notion that Wilhelmsen acted as a mere broker in these transactions. As the late Judge Casey's decision in *Sea Transport Contractors v. Industries Chimiques Du Senegal*, 411 F. Supp. 2d 386 (S.D.N.Y. 2006) demosntrate, the role played by Wilhelmsen here is not that of a traditional broker. In STC, Plaintiff ("STC") was retained by defendant ("ICS") to act on ICS's behalf in managing various aspects of ICS's business related to shipping its cargo. *See id.* at 389. STC sued ICS for breach and commenced a Rule B proceeding in New York. *Id.* Similar to UBS here, ICS

9

moved to vacate the attachment order on grounds that the STC/ICS contract was not a maritime contract because it was a brokerage contract or, alternatively, it was a preliminary contract. *Id.* at 392. Judge Casey rejected ICS's broker argument for reasons that are equally applicable to the relationship that exists here. He ruled that the STC/ICS contract was not a brokerage contract because it called for STC to create distinct tiered contracts between ICS and STC, because STC's profit on the contract would be based on freight differentials, and because STC's compensation would not be based on commissions. *Id.* at 394.

In this case, satisfaction of Wilhelmsen's duties under the UBS/Wilhelmsen contract did not lead to a contract between UBS and Sumitomo, but rather to tiered contracts between UBS and Wilhelmsen and another between Wilhelmsen and Sumitomo. Like the freight differential profit to be earned by STC, Wilhelmsen's profit was based on differentials in the fuel sale price between the two contracts. Wilhelmsen has paid Sumitomo directly for Sumitomo's provision of the bunkers to the nominated vessels. A broker has no obligation to pay on behalf of its principal in a broker's contract. Instead, the principal pays for the services obtained by the broker and the broker receives its commission from the principal. None of these indicia is characteristic of a brokerage agreement. Furthermore, UBS concedes that two separate contracts are present here back-to-back, rather than one between UBS and Sumitomo on which Wilhelmsen acted as a broker. Perhaps most significantly, UBS notified Wilhelmsen of a potential contamination claim and has reserved its right before this Court to seek counter-security from Wilhelmsen. Hearing Tr. at 52. Such a claim would not properly be made against a broker that procured a supply contract with a third party. It would be proper, however, against a party that undertook to supply conforming fuel to a nominated vessel.

Even if I were to characterize Wilhelmsen as a broker or intermediary in these bunkering deals, that does not preclude this Court from finding maritime jurisdiction for Wilhelmsen's claims. While charter broker and insurance broker claims long have been held to be non-maritime (*see e.g. Boyd, Weir & Sewell, Inc. v. Fritzen-Halcyon Lijn, Inc.*, 709 F. Supp. 77 (S.D. N.Y. 1989)), there are a number of bunkering dispute cases where district courts and circuit courts of appeal have treated claims such as Wilhelmsen's as subject to admiralty jurisdiction— whether characterizing the intermediate entity as a "broker," "subcontractor," or something else.

In *Galehead, Inc. v. M/V ANGLIA*, 183 F.3d 1242 (11th Cir. 1999), the alignment of the parties was identical to that of the parties in this proceeding, in that there was a four-way transaction. The charterer Genesis (equivalent to the U.S. government here) requested the efforts of Polygon (UBS here) to obtain fuel in Florida. *Id.* at 1244. Polygon contacted Asamar (Wilhelmsen here) to supply the fuel. *Id.* Asamar contracted with Coastal (Sumitomo here) to physically supply the bunkers to the vessel. *Id.* As in this case, the bunker confirmation listed Coastal as the physical supplier and Asamar as the seller. *Id.* Asamar paid Coastal (just as Wilhelmsen has paid Sumitomo); Asamar, however, was not paid (just as UBS has not paid Wilhelmsen). *Id.*

A second bunkering occurred with similar parties involved, with the exception that ChemOil and Marsh were the physical suppliers who supplied the vessel. They were paid by Asamar, with Asamar once again not being paid. *Id.*

A third bunkering occurred without Asamar's involvement, in which Polygon was listed as the seller and ChemOil and Tesoro were the physical suppliers. *Id.* Polygon paid ChemOil and Tesoro, but was not paid by Genesis. *Id.*

All of Polygon and Asamar's claims were purchased by, and assigned to, Galehead. *Id.*

11

Galehead filed a complaint *in rem* against the vessel, alleging that it had maritime lien claims against the vessel based on Asamar's and Polygon's bunker claims. *Id.* Notably, the district court categorized both Asamar and Polygon as "fuel brokers" based on their intermediate status in the transaction. *See, e.g., Galehead, Inc. v. M/V ANGLIA*, 15 F. Supp. 2d 1304, 1307 (S.D. Fla. 1998). Applying admiralty law, the district court ruled that Polygon had a maritime lien claim against the vessel and Asamar did not. 183 F.3d at 1244. Galehead appealed the district court's decision. *Id.* On appeal, the Eleventh Circuit affirmed the district court's decision:

> To obtain a maritime lien, a person must: (1) provide necessaries; (2) to a vessel; (3) on the order of the owner or agent. While Polygon satisfies all three of the elements, Asamar fails on element number three and does not qualify for its two liens. So, Galehead is entitled to only one lien.

*Galehead*, 183 F.3d 1242, 1244-47 (11th Cir. 1999) (emphasis supplied).

The Eleventh Circuit's decision in *Galehead* is relevant because it expressly recognizes that Asamar must be deemed to have (1) provided necessaries (2) to a vessel. While these two elements do not alone entitle Asamar to a maritime lien (the precise issue in Galehead, which is not the issue facing me), they establish a maritime claim warranting the use of Rule B. *See, e.g., Gulf Marine & Indus. Supplies, Inc. v. New Filipino Maritime Agencies, Inc.*, No. 01-0555, 2001 WL 277924 (E.D. La. Mar. 20, 2001). Various other circuit court and district court decisions involving bunkering services support its position that its claim is maritime in nature. *See Tramp Oil & Marine, Ltd. v. M/V MERMAID I*, 805 F.2d 42 (1st Cir. 1986); *A/S Dan-Bunkering Ltd. v. M/V ZAMET*, 945 F. Supp. 1576 (S.D. Ga. 1996); *Trans-Tec Asia v. M/V HARMONY CONTAINER*, No. CV 04-1160, 2004 WL 3820556 (C.D. Cal. Dec. 28, 2004) (*Trans-Tec I*), *related case at* 435 F. Supp. 2d 1015

12

(C.D. Cal. 2005) (*Trans-Tec II*).

Keeping in mind the Supreme Court's instruction that "Precedent and usage are helpful insofar as they exclude or include certain common types of contract," *Kossick*, 365 U.S. at 735, and its further caution not to focus on the status of the parties but rather the nature of the transaction, *Exxon*, 500 U.S. at 611-612, the jurisdictional question reduces to the following issue – does a contract for furnishing fuel to a vessel qualify as a maritime contract such that admiralty jurisdiction is proper? The *Exxon* Court answered this question unequivocally – it does, regardless of whether the fuel is provided by the plaintiff directly or by a third party at the order of the plaintiff. *Id.* at 612-613.

UBS also argues that the UBS/Wilhelmsen contracts were "preliminary" and outside admiralty jurisdiction. As discussed earlier, the UBS/Wilhelmsen agreements bound Wilhelmsen to bunker the nominated vessels. It could satisfy that obligation by hiring a sub-contractor (such as Sumitomo) to carry out the physical supply function. In the event that Sumitomo was unable to perform, however, Wilhelmsen's procurement of Sumitomo as a physical supplier did not satisfy its obligations under the UBS/Wilhelmsen agreements. Rather, Wilhelmsen would have been compelled to procure a substitute physical supplier or be found in breach its contract with UBS. There is nothing "preliminary" about the UBS/Wilhelmsen agreements. See *Sea Transport Contractors*, 411 F. Supp. 2d at 394

Accordingly, Wilhelmsen dispute with UBS over the bunkering agreements are subject to admiralty jurisdiction. UBS's motion to lift the attachment is denied.

### Wilhelmsen's Claims Against RaeCorp

Plaintiff's Amended Complaint alleges an alter ego/successor/veil piercing claim against

Raecorp. Defendants argue that The Rule B attachment against the property of Raecorp should be be vacated because the allegations in the amended complaint do not rise to the level required by Rule E and do not evidence a "fair probability" that the claim is valid.

As a threshold matter, I reject defendants' presumption that the applicable standard to be applied to plaintiff's pleadings is the "fair probability" standard. The majority of courts in this district have understood *Aqua Stoli* to require the application of the *prima facie* standard when considering the adequacy of a claim in a maritime vacatur motion. *See Dolco Inves., Ltd. v. Moonriver Dev., Ltd.*, 486 F. Supp. 2d 261, 266 (S.D.N.Y. 2007); *SPL Shipping Ltd.*, 2007 WL 831810, at *3; *Tide Line, Inc. v. Eastrade Commodities, Inc.*, No. 06-cv-1979, 2006 U.S. Dist. LEXIS 95870 (S.D.N.Y. Aug. 15, 2006); *but see Wajilam Exps. (Singapore) Pte. Ltd. v. ATL Shippping Ltd.*, 475 F. Supp. 2d 275 (S.D.N.Y. 2006) (applying a "reasonable grounds" standard when assessing the *Aqua Stoli* factors). This court agrees with the weight of authority in this district and will apply the *prima facie* standard.

Under this standard, the Court looks only to the Complaint to determine whether the plaintiff has alleged a valid admiralty claim against the defendant. *SPL Shipping*, 2007 WL 831810, at *3; *see also Aqua Stoli*, 460 F.3d at 445; *Tide Line*, 2006 U.S. Dist. LEXIS 95870, at *16. "Maritime plaintiffs are not required to prove their cases at this stage of a Rule E(4) hearing." *Transportes Navieros Y Terrestes, S.A. De D.V. v. Fairmount Heavy Transp. N.V.*, No. 07 Civ. 3076 (LAP), 2007 U.S. Dist. LEXIS 50260 (S.D.N.Y. July 6, 2007) (citation omitted). Moreover, *Aqua Stoli* implies that a plaintiff need not provide evidence showing that it has a claim against the defendant to satisfy its burden under Rule E(4)(f). *Tide Line*, 2006 U.S. Dist LEXIS 95870, at *16.

The *prima facie* standard in the maritime attachment context is a pleading requirement, not

an evidentiary standard, and differs from the use of that phrase in other contexts. *Id.* at *17 n.7. To plead a valid *prima facie* admiralty claim, Supplemental Rule E(2)(a) requires that a complaint ". . . state the circumstances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading." Fed. R. Civ. P. Supp. R. E(2)(a). This standard is more stringent than the pleading requirements of the Federal Rules of Procedure. *United States v. 4492 S. Livonia Rd.*, 889 F.2d 1258, 1266 (2d Cir. 1989); *Tide Line*, 2007 U.S. Dist. LEXIS, at *24.

Wilhelmsen's Amended Verified Complaint satisfies this threshold standard by alleging the following alter ego allegations against Raecorp:

> RaeCorp is the alter ego of, and/or successor to, USS-UBS. Alternatively, RaeCorp so dominates USS-UBS that this Court should disregard the corporate veils between the defendants. USS-UBS and RaeCorp both have the same sole director, Mr. William Rae.USS-UBS and RaeCorp have the same address: Unit 2, 50 Borthwick Avenue, Murarrie, QLD 4172, Australia.USS-UBS and RaeCorp have the same telephone number: +61 7 3902 0800.USS-UBS use the same web address for their website.  RaeCorp's website is listed on Mr. Rae's correspondence as www.raecorpint.com. When that weblink is accessed, the web user is transferred to the http://www.ubsprov.com.au/ home page, which is the web homepage for USS-UBS.
> Mr. Rae responds to correspondence related to USS-UBS with a RaeCorp e-mail suffix (billrae@raecorpint.com) and he uses the terms RaeCorp and USS-UBS interchangeably in corporate advertising literature (e.g., "All sales are made in accordance with Raecorp's (USS-UBS Int's) General Terms and_Conditions, which are available on request").

Amended Complaint ¶¶ 14-16.    These alter ego allegations were not specifically challenged by UBS, either in there papers or at the hearing.

Furthermore, after Raecorp was added as a defendant, a payment made by Raecorp to defendants' counsel was intercepted at Bank of America. That payment was made by Raecorp to pay

UBS's outstanding legal invoices with its counsel. Rule E Hearing Transcript Page 12.

Wilhelmsen's burden at this stage is minimal, whether that burden is defined by the *prima facie* admiralty claim standard, the reasonable grounds standard or as defendant characterizes it, the "fair probability" standard. In *Ullises Shipping Corp. v. Fal Shipping Co.*, 415 F. Supp. 2d 318 (S.D.N.Y. 2006), Judge Scheindlin, applying the "reasonable grounds" standard, held that plaintiff sustained its burden merely by showing that the alter ego had paid one invoice of the primary defendant. In *A. Coker & Co. v. Nat'l Shipping Agency*, No. 99-1440, 1999 WL 371941 (E.D.La. May 17, 1999), it was met by showing insufficient capitalization, the alter ego's guarantee of the primary defendant, and that the two companies *may* have shared offices. Here, Wilhelmsen has shown Raecorp's payment of a UBS invoice; it likewise has submitted documentation to this Court showing common addresses, common telephone numbers, common principals, intermingled advertising and e-mail addresses. And UBS's counsel's admissions at the recent scheduling conference indicate that UBS is insufficiently capitalized.

Wilhelmsen has successfully pled an admiralty claim against Raecorp. The motion to vacate the Rule B attachment against Raecorp property is denied.

### Interlocutory Appeal Not Warranted

Finally, defendants ask this Court to certify this case for interlocutory appeal because a substantial difference of opinion exists on the issue of whether an EFT may constitute "property" of a defendant subject to attachment under Rule B. As state above, supra at 4, the law in this circuit is that EFTs are subject to a maritime attachment. *See Aqui Stoli*, 460 F.2d at 436. Accordingly, UBS has not shown the extraordinary circumstances necessary to warrant a grant of certification for interlocutory appeal. See *See, e.g., Compania Sudamericana de Vapores S.A. v. Sinochem Tianjin*

Co., No. 06 Civ. 13765 (WHP), 2007 WL 1002265, at *4 (S.D.N.Y. Apr. 4, 2007).

Accordingly, defendants' motion is denied in its entirety.

September 28, 2007

_____

Colleen McMahon, U.S.D.J.