William J. Honan
Michael J. Frevola
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY 10007-3189
(212) 513-3200

ATTORNEYS FOR PLAINTIFF
WILHELMSEN PREMIER MARINE FUELS AS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WILHELMSEN PREMIER MARINE FUELS AS,<br><br>Plaintiff,<br><br>-against-<br><br>UBS PROVEDORES PTY LTD. a/k/a<br>USS-UBS INTERNATIONAL and<br>RAECORP INTERNATIONAL PTY LTD.,<br><br>Defendants. | 07 Civ. 5798 (CM)<br><br>**AFFIRMATION OF<br>HANS M. BORGE PURSUANT<br>TO 28 U.S.C. § 1746 IN<br>SUPPORT OF PLAINTIFF'S<br>OPPOSITION TO DEFENDANTS'<br>MOTION TO VACATE<br>MARITIME ATTACHMENT** |

I, HANS M. BORGE, hereby affirm as follows:

1. I am a bunker trader/broker employed by Wilhelmsen Premier Marine Fuels AS ("Wilhelmsen"). The facts provided herein are based on my own personal knowledge.

2. I am providing this affirmation in support of the opposition of Wilhelmsen's opposition to a motion to vacate maritime attachment filed by UBS Provedores Pty Ltd. a/k/a USS-UBS International ("UBS") and Raecorp International Pty Ltd. ("Raecorp").



3. Wilhelmsen acts as both a broker and a supplier of bunkers to seagoing vessels at a variety of ports worldwide. I have been employed in the bunker supply industry since 1979, most of which time I have been employed by Wilhelmsen or predecessor companies to the present Wilhelmsen company. Prior to 1979, I spent seven (7) years as a shipbroker. Before becoming a shipbroker, I served four (4) years as an engineering officer and chief engineer in the Royal Norwegian Navy after graduating from the Norwegian Naval Academy in 1964.

4. Wilhelmsen entered into a series of agreements with UBS to provide vessels nominated by UBS with bunkers in the ports of Sasebo and Naha in Japan. With regard to Wilhelmsen's claims in this proceeding, UBS nominated the following vessels on the following dates:

   a. the SS MAJOR STEPHEN PLESS at Sasebo on January 19, 2007;

   b. the USNS SUMNER at Naha on January 31, 2007;

   c. the USNS MARY SEARS at Sasebo on March 3, 2007;

   d. the HSV WESTPAC EXPRESS at Naha on March 20, 2007;

   e. the USNS BOWDITCH at Sasebo on March 21, 2007;

   f. the SS MAJOR STEPHEN PLESS at Sasebo on March 26, 2007;

   g. the USNS MARY SEARS at Naha on April 9, 2007;

   h. the HSV WESTPAC EXPRESS at Naha on April 20, 2007;

   i. the USNS BOWDITCH at Naha on April 23, 2007; and

   j. the SS CAPE JACOB at Sasebo on May 1, 2007.

True copies of Wilhemsen's invoices to UBS for these services are annexed as Exhibit 1.

5. Each time that UBS contacted Wilhelmsen to bunker a nominated vessel, Wilhelmsen replied with an e-mail confirming the UBS/Wilhelmsen agreement and which stated the vessel nomination, the port at which the bunkering would occur, the date anticipated for the bunkering, the type of fuel and quantity required, the application fuel specifications, and the sales price offered by Wilhelmsen for that bunkering operation. Additionally, each of these confirmations included an incorporation of the terms and conditions of the local supplier, Sumitomo Corporation Europe Ltd. ("Sumitomo"), as governing the relationship between UBS and Wilhelmsen. A true representative copy of a bunkering nomination confirmation by Wilhelmsen sent to UBS is annexed as Exhibit 2. A true copy of the Sumitomo General Terms and Conditions is annexed as Exhibit 3.

6. In accepting UBS's nomination, Wilhelmsen undertook to bunker the nominated vessel under the terms of the Sumitomo General Terms and Conditions. Under those General Terms and Conditions, Wilhelmsen would be responsible to UBS for a failure to bunker a vessel in the specified Japanese port at the designated time. Wilhelmsen has successfully performed each bunkering operation as was nominated by UBS.

7. Wilhelmsen did not use its own employees and services to physically supply the bunkers that were requested by UBS for the nominated vessel. Instead, as is common in the bunkering industry, Wilhelmsen used a local supplier to physically supply the vessel in accordance with Wilhelmsen's instructions. In doing so, Wilhelmsen entered into a separate contract with that local supplier, Sumitomo, to carryout the requested bunkering operations.

3



8. Sumitomo carried out each of the physical supply operations requested by Wilhelmsen for the vessels nominated above in the subparagraphs of paragraph 4. After carrying out each bunkering operation, Sumitomo would invoice Wilhelmsen between seven (7) and fourteen (14) days after delivery to the vessel. Wilhelmsen's obligation to pay Sumitomo required payment within thirty (30) days of delivery of the bunkers aboard the vessel. This is standard within the industry. Wilhelmsen paid Sumitomo in full for each of the stated bunkering operations. True copies of each of the payments made to Sumitomo are annexed as Exhibit 4 (in certain cases, the amounts do not correspond directly with individual Sumitomo invoices because the payments at issue at times were paying multiple invoices with one funds transfer).

9. Under the Wilhelmsen/Sumitomo contracts and the UBS/Wilhelmsen contracts, transfer of possession and ownership of these bunkers occurred at the receiving flange of the vessel being bunkered. In effect, possession and ownership instantaneously transferred from Sumitomo to Wilhelmsen, from Wilhelmsen to UBS, and finally from UBS to the U.S. Government.

10. Despite Wilhelmsen having bunkered nominated vessels at the request of UBS through the retention of a local physical supplier, and despite Wilhelmsen having paid Sumitomo for the bunkers provided to denominated vessels at UBS's request, UBS has not paid Wilhelmsen for the vessel bunkerings listed in the subparagraphs of paragraph 4 above.

11. I understand that UBS has represented to the Court in this proceeding that UBS has not paid Wilhelmsen because it has not provided adequate documentation to UBS of the transportation and other costs associated with the total price of Wilhelmsen's bunkers invoices to UBS. UBS previously has asked that Wilhelmsen provide such information to UBS.

4



Wilhelmsen does not have this information because the nature of the Wilhelmsen's contracts with Sumitomo and the nature of Wilhelmsen's contracts with UBS both were based on FOB (Freight on Board) terms. FOB terms mean that the purchaser of the bunkers pays its set price for the product delivered to the receiving vessel.

12. I understand that the principal of UBS, Mr. Bill Rae, has provided a statement to this Court which states:

> The dispute [between UBS and Wilhelmsen] arises out of Wilhelmsen's failure to adequately document its invoices submitted to UBS. Because of the inadequate documentation, the US Navy has refused to pay UBS. UBS, in turn, cannot pay Wilhelmsen.

This statement by Mr. Rae misrepresents the nature of the contracts between Wilhelmsen and UBS. As stated above, each of the contracts between UBS and Wilhelmsen for bunkering the vessels at issue was arranged on FOB terms for delivery to the nominated vessel. In other words, Wilhelmsen quoted a lump sum per metric ton for delivery to the vessel, which sum UBS could accept or reject. The lump sum amount provided by Wilhelmsen included all expenses of transportation, storage and similar items. The one item that it did not include was for costs of placing an oil spill containment boom around the vessel during the bunkering operation, which amounted to approximately $1,500 per bunkering operation and which was reflected on each Wilhelmsen invoice to UBS. This applies to Sasebo bunkering operations and is standard in most parts of the main Japanese islands.

13. In connection with Mr. Rae's contention that UBS's attempts to obtain payment from the U.S. government are being hampered by Wilhelmsen, I have attached three e-mails that Wilhelmsen received from a U.S. government official who was involved in the review of UBS's

claims. That official, Mr. Rene M. Fry, is the Military Sealift Command's Fuel Manager and Agency Program Coordinator. Mr. Fry first contacted me on his own initiative on May 21, 2007 in response to reports that he had received regarding Wilhelmsen not being paid by UBS. I attach a true copy of his e-mail to me dated May 21, 2007 as Exhibit 5. We then exchanged e-mails over the next two days regarding Wilhelmsen's situation, a true copy of which I annex as Exhibit 6. Wilhelmsen (through my colleague Knut Bjornebye) later received on August 31, 2007 a follow up e-mail from Mr. Fry in response to our inquiries seeking to confirm whether UBS was awaiting further payment from the U.S. government on vessels that had been bunkered by Wilhelmsen. Mr. Fry's response stated that UBS had been paid in full for the bunkering of vessels in which Wilhelmsen had participated, and that UBS's claims pending before the U.S. government were for costs that were not covered by the government's contract with UBS and were not approved by the government. Mr. Bjornebye forwarded me a copy of that e-mail, a true copy of which I annex as Exhibit 7. The comments in Norwegian that accompany Mr. Bjornebye's cover e-mail to me can be translated as follows: "Hans, I finally got something back from Frey. That makes situation a little clearer. Let us discuss on Monday. Knut"

14. Prior to UBS making its bid on the U.S. Government contract, UBS contacted Wilhelmsen's Singapore office to obtain information regarding bunkers prices in Japan. Significantly, the inquiry made by UBS requested a "spot" price as opposed to an extended contract price. In other words, UBS inquired about the costs of a one time fueling at the current rates in Japan, rather than the cost of a long term requirements contract.



15. In addition to UBS's limited inquiry regarding "spot" market prices in Japan, it is also important to consider that the price quotations for bunkers in Japan that are provided in PLATTS Bunkerwire (a leading industry periodical that quotes market rates in a variety of locations) states the price for fuel in Japan as the cost of marine diesel oil in Tokyo Bay. Marine diesel oil is a black oil that is heavy and less refined than the fuel oil required in the vessel nominations at dispute in this case. The fuel oil required for the vessel nominations in this case was for gasoil, which is a lighter and more refined fuel that costs approximately $100 per metric ton (approximately 15% greater price) more than marine diesel oil.

16. Furthermore, the PLATTS quotation for marine diesel oil in Tokyo Bay does not take into account the cost of transporting that oil to locations remote from Tokyo Bay. In the context of both Sasebo and Naha, these locations are located considerable distances away from Tokyo Bay and therefore require the incurring of significant barging expenses to place the bunkers in position to fuel the nominated vessels. The expenses for coastwise barging are especially significant in Japan because, similar to the U.S. Jones Act in U.S. waters, these barging voyages were required to be performed by Japanese flag vessels and the demand for such vessels is very high.

17. I understand that UBS has contended that Wilhelmsen acted as a fuel broker in participating in the bunkering of the vessels at issue in this dispute. A significant part of Wilhemsen's business does involve acting as a fuel broker, and Wilhelmsen is one of the larger bunker brokers in the world. In this transaction, however, Wilhelmsen entered into separate contracts with both UBS and with Sumitomo for the bunkering of the nominated vessel; UBS did not enter into a direct contract with Sumitomo. Wilhelmsen's compensation for participating in



these transactions was not based on a commission resulting from the confirmation of a contract between UBS and Sumitomo. Rather, Wilhelmsen was invoiced by Sumitomo for the fuel that Wilhelmsen bought from Sumitomo, then Wilhelmsen invoiced UBS a greater lump sum amount for bunkering the nominated vessels. In a broker situation, Wilhelmsen would be retained by a party seeking to bunker a vessel and asked to investigate pricing amongst various local suppliers to obtain the best rate in combination with the best service available at the port in question. Wilhelmsen would then recommend which local supplier that should be used by Wilhelmsen's client, at which time the client and the local supplier would enter into a direct contract. If that contract was completed, Wilhelmsen's brokerage contract with the client would provide for Wilhelmsen to get a brokerage fee for bringing the parties together. This did not happen in any of the vessel nominations involved in this dispute, and never was the arrangement between UBS and Wilhelmsen for any of the bunkering that have occurred in Japan for UBS since Wilhelmsen started performing under agreements with UBS in September 2006.

18. UBS also has threatened to take legal action against Wilhelmsen for an alleged contamination of bunkers on the USNS Bruce C. Heezen delivered on October 23, 2006. Documentation on the bunkers confirmed that the product was within specification when delivered to the vessel. The last correspondence that we received on this matter, as far as I can remember, was on November 21, 2006 when the clean barge certificate was produced.

19. I understand that UBS has characterized the primary purpose of Wilhelmsen's involvement in this case as providing introductions to local suppliers in Japan and provided extensions of credit to UBS through which UBS could complete its bunkering transactions with local suppliers. Wilhelmsen's participation in bunkering operations extends to coordinating

8



fueling operations from the time that the vessel is nominated to the time when the bunkering of that vessel is complete. This process requires coordination with the physical supplier to ensure that the fuel to be loaded aboard the nominated vessel is positioned in time for the arrival of the nominated vessel, and with the local port agents to ensure that the vessel fuel loading window does not conflict with other vessel activities (such as loading ammunition or other activities that would prevent the bunkering of the vessel at the same time). Coordinating these operations is a skill obtained through Wilhelmsen's personnel having spent years in the industry and being familiar with the capabilities of the market, the facilities available in various locals, its relationships with local suppliers and with local port agents to coordinate operations, and its knowledge of various competitors that it can use to obtain the lowest price for the vessel owner or the vessel's representative. An added benefit that Wilhelmsen can improvise, which provides Wilhelmsen a competitive advantage against some its competitors, is that Wilhelmsen's reputation in the industry enables it to obtain bunkers on credit of local suppliers rather than having to pay for those bunkers in advance. In this situation, Wilhelmsen's relationship with Sumitomo enabled it to occur. If UBS did have some contact with Sumitomo because UBS did have a local representative in Sasebo that it did communicate at times with Sumitomo. UBS did not need Wilhelmsen to form the contact with Sumitomo, it needed Wilhelmsen to coordinate operations for loading these vessels and to work with Sumitomo in completing the actual refueling of the vessels when UBS requested it. Wilhelmsen also has the industry knowledge to find the right supplier for the products sought by the vessel and also to find the right characteristics of fuel that would suit the vessel of individual needs.



WHEREFORE, it is respectfully requested that this Court deny the Defendants' motion to vacate the Order of Attachment issued in this proceeding, and grant such other and further relief to the Plaintiff as may be appropriate.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 20th day of September, 2007 at Lysaker, Norway.

HANS M. BORGE

