1

79otwila            Argument

1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  -----------------------------x
2
3  WILHELMSEN PREMIER MARINE
3  FULES AS,
4
4          Plaintiff,
5
5      v.                07 CV 5798 (CM)
6
6  UBS PROVEDORES PTY LTD,
7
7          Defendant.
8
8  -----------------------------x
9                          New York, N.Y.
9                          September 24, 2007
10                          10:00 a.m.
10
11  Before:
11
12          HON. COLLEEN MCMAHON,
12
13                          District Judge
13
14          APPEARANCES
14
15  HOLLAND & KNIGHT
15      Attorneys for Plaintiff
16  BY:  MICHAEL J. FREVOLA
16      WILLIAM HONAN
17      KERI ANN KILCOMMONS
17
18  BETANCOURT, VAN HEMMEN, GRECO & KENYON
18      Attorneys for Defendant
19  BY:  JEANNE-MARIE D. VAN HEMMEN
19
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2

79otwila                    Argument

1          THE COURT:  Good morning, good morning.
2          Can somebody point me wherever in this record I will
3  find the contract, not invoices, the contract between the
4  plaintiff and the defendants?  I can't find it.
5          MS. VAN HEMMEN:  Your Honor, I have the document that
6  will help pointing to this in finding that.
7          THE COURT:  But there's some contract that provides
8  for arbitration in London, I know that.  I can't find this
9  document.  Where is it in this record?
10         MR. FREVOLA:  Your Honor, in terms of the actual
11  combination of documents, if you look at the -- I believe it's
12  the Hans Borge affidavit, Exhibit 2, your Honor, is a
13  representative example of the nominations.  Essentially these
14  were a recap of the conversation between UBS and Wilson where
15  the terms of that particular transaction were agreed, and the
16  supplier's terms and conditions were referenced, which is
17  Exhibit 3 right behind it.
18         THE COURT:  So what you're saying is that there is no
19  overall contract pursuant to which the parties entered into an
20  ongoing arrangement, but instead there were individual
21  nominations which were made subject to the terms and
22  conditions?
23         MR. FREVOLA:  Yes, your Honor.
24         THE COURT:  In each of these instances.
25         MR. FREVOLA:  Yes, and oral contracts in maritime law
                SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

3

79otwila                    Argument

1    are completely enforceable.
2          THE COURT:  Oral contracts are enforceable in a lot of
3    ways.  Is there an oral overall contract someone will testify
4    to?
5          MR. FREVOLA:  No, is this is a case-by-case basis.
6          THE COURT:  So transaction by transaction.
7          MR. FREVOLA:  Yes, your Honor.
8          THE COURT:  Thank you.  I just needed to have that
9    cleared up.
10          Okay.  Ms. Van Hemmen, you're more or less the
11    plaintiff here, you're the proponent here.  Do you want to put
12    somebody on the stand?  If you want to point to things that I
13    should look at, if you want to argue.  Obviously I have read
14    the papers, but as you all know, this is all Greek to me.
15          MS. VAN HEMMEN:  Yes, your Honor.  There's been a
16    development over the weekend that has sort of taken me by
17    surprise, and it changes the posture of things here, and it was
18    a statement in the memorandum of law filed by Wilhelmsen in
19    opposition to our motion to vacate in which they stated in
20    either the final page or penultimate page that they no longer
21    intended to arbitrate in London but instead intend to litigate
22    New York.
23          It seems to me that their intentions to arbitrate in
24    London was the factual predicate for the attachment that has
25    occurred.  9 Section of the U.S. Arbitration Act, Section 8,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4

79otwila                    Argument

1    specifically allows an attachment under these very narrow
2    circumstances, and my understanding is those were the
3    circumstances under which we were operating, and then in just
4    one sentence at the very end of the memo of law I now learn
5    it's not.
6        I, as an attorney, can only analyze defenses based on
7    the pleadings in front of me.  That is a fundamental change
8    from a position taken I think in three different paragraphs of
9    the verified complaint.
10        THE COURT:  The complaint that was presented to me
11   indicates there was a contract subject to a London arbitration
12   clause but that no arbitration had as of yet been commenced.  I
13   must say I think I overlooked this.
14        MS. VAN HEMMEN:  Are you looking for the sentence in
15   the memorandum of law?
16        THE COURT:  I'm looking -- I actually --
17        MS. VAN HEMMEN:  It's on page 24 of Wilhelmsen's
18   memorandum of law in opposition.  It begins the very last
19   incomplete sentence on 24 and finishes up on 25.  It seems to
20   me that on that basis alone, your Honor, the attachments would
21   have to be vacated subject to a new complaint that says in fact
22   what they do intend to do and the legal predicate for it.
23        MR. FREVOLA:  Your Honor, there's a case called The
24   Anaconda, your Honor, a Supreme Court case back in the 1940s
25   that deals with this.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5

79otwila                Argument

1          THE COURT:  I haven't read it.  I don't know anything
2   about it.
3          MR. FREVOLA:  Your Honor, we would be glad to brief
4   the supplementary.  I argued the very point in front of Judge
5   Karas two weeks ago and Judge Karas in my view properly upheld
6   our attachment.
7          And essentially we're basically saying that while we
8   think that there is an arbitration clause that could be
9   incorporated here and govern, in light of circumstances that
10  have arisen over the last several weeks, my client has
11  basically said that the idea of a potential receivership
12  proceeding in Australia, a supplementary attachment proceeding
13  in New York and an arbitration in London, it make sense to
14  essentially waive the arbitration clause.
15         THE COURT:  They may not waive the arbitration clause.
16         MR. FREVOLA:  They may not, your Honor.
17         THE COURT:  In which case I'm going to have a motion
18  to dismiss or stay pending arbitration.
19         MR. FREVOLA:  Yes, your Honor, you could have that.
20  But in terms of basically --
21         THE COURT:  Can't we avoid that somehow?
22         MR. FREVOLA:  Your Honor, if they indicate they want
23  to go to London, and they do indicate that, then your Honor,
24  we'll stipulate to that and go to London.
25         Originally, the last hearing your Honor --

               SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

6

79otwila                    Argument

1          THE COURT:  Tell me about The Anaconda, the Supreme
2    Court case because I have to say I find to whole procedure
3    pretty -- I find it really outrageous that you can come in and
4    get an attachment before you commence any proceeding, and then
5    to be told that you're not going to commence the proceeding
6    that you told me to commence is a little problematic for me.
7          MR. FREVOLA:  9 USC Section 8 allows you to, instead
8    of starting arbitration --
9          THE COURT:  I know that.
10          MR. FREVOLA:  In terms --
11          THE COURT:  But it anticipates you're going to
12    commence the arbitration.  For example, if six months passed
13    and nothing happened I would definitely entertain a motion to
14    vacate the attachment on the ground this wasn't in aid of
15    arbitration, this was something else.
16          MR. FREVOLA:  Agreed, your Honor.  In terms of -- I
17    believe it's the Anaconda this happened, there were several
18    cases we mentioned, but The Anaconda is the premiere U.S.
19    Supreme Court case on this issue.  It was an issue of whether
20    or not the attachment that had been brought was improper
21    because it had been done before an arbitration was commenced or
22    anything had gone forward on it.  Supreme Court said no,
23    Section 8 gives the absolute right to do this.
24          THE COURT:  But --
25          MR. FREVOLA:  And if they chose to forego their suit
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

7

79otwila              Argument

1  in arbitration, the arbitration, and instead proceed through
2  litigation to enforce their rights.  And essentially all that
3  statement --
4          THE COURT:  The citation for that we can pull it up
5  and I can add it to my reading list.
6          MR. FREVOLA:  I don't have that citation on me, your
7  Honor.  I get it to you a half hour after I leave this
8  courtroom.
9          THE COURT:  Actually you have an associate here who
10  could go make a phone call back at the office and get it.
11          MR. FREVOLA:  Sure.
12          THE COURT:  That's why I used to sit at -- it was one
13  of my jobs when I was very young.
14          MS. VAN HEMMEN:  Your Honor, would you like us to
15  proceed as though that had not bubbled up and continue with the
16  hearing?
17          THE COURT:  We're dealing with more issues here.
18          MS. VAN HEMMEN:  I'm sorry, your Honor?
19          THE COURT:  Yes, let's go.  I got to pick a jury this
20  afternoon.
21          MS. VAN HEMMEN:  Your Honor, that issue aside, as far
22  as the prime issue of whether there's even a maritime contract
23  here, you had not scheduled a reply, I therefore did not file a
24  reply.
25          THE COURT: I didn't want a reply.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8

79otwila                Argument

1          MS. VAN HEMMEN:  However, your Honor, I did take a
2     look at all of the cases that were cited by Mr. Frevola, and I
3     did draft something up, so if of the Court wants it I'll be
4     happy to what hand it up.  Mr. Frevola had a copy of it since
5     Saturday.  But if you would rather not, I will give it to you
6     orally.  It might help in the future recapping my arguments.
7          MR. FREVOLA:  Your Honor, we don't have an objection
8     to her handing it up.
9          THE COURT:  You'll have to give it me orally anyway
10    because I'm not going to sit here and read it.
11         MS. VAN HEMMEN:  Mr. Frevola relies heavily on a whole
12    group of bumper broker cases and indicates that somehow those
13    cases support his position that the contract at issue here
14    should give rise to a maritime contract.
15         THE COURT:  At least now I know what the contract at
16    issue here is.  That was my problem all weekend is I couldn't
17    find the contract, therefore I was at a loss to evaluate what I
18    read in the cases with what the facts were.
19         MS. VAN HEMMEN:  Your Honor, I have the piece of paper
20    that they contend --
21         THE COURT:  It's open in front of me, and then
22    attached to it are the Sumitomo general conditions.
23         MS. VAN HEMMEN:  Those cases don't support the
24    proposition that they were cited for.  In fact, taken as a
25    whole, support completely UBS's position in this case.  Each

9

79otwila                    Argument

1    and every one -- first of all, those cases were an analysis of
2    whether or not the middle men bunker broker had a right to a
3    maritime lien on the ships to which the marine fuel oil at
4    issue in the transactions ultimately was loaded onto.
5           THE COURT:  That's what this exercise used to be about
6    until a few years ago.
7           MS. VAN HEMMEN:  That's right, your Honor.  So the
8    whole collection of cases having to do with the arrest of a
9    ship and then the question of whether or not these bunker
10   brokers were going to have an in rem right in connection with
11   that ship.  In fact, the analysis is done under Federal
12   Maritime Lien Act statutory requirements, so it really is very
13   different than the analysis done for whether or not a maritime
14   contract exists.
15          However, both the statutory requirements and the
16   analysis of whether maritime contract exists relate to whether
17   or not certain claims should have the benefit of these unique
18   and extreme maritime remedies.  And so for that reason it seems
19   to me that they do in fact relate to one another.
20          In each of the cases where the bunker broker
21   contracted directly with the ship operator, the court allowed
22   the bunker broker to have a lien on the ship.  In each of the
23   cases where the bunker broker was a middle man, a stranger to
24   the ship on the one hand and a stranger to the vessel operator
25   on the other hand, the courts refused to give that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

10

79otwila                Argument

1   extraordinary maritime remedy.  They held that they weren't
2   sufficiently closely related to the -- well, they didn't say
3   trafficking in vessels because of course that's a maritime
4   contract analysis, they held they hadn't furnished these things
5   on the order of the ship owner.  There needed in each one of
6   those cases to be that direct relationship.  There is no such
7   direct relationship in this case.
8        UBS had a contract with a vessel operator.  UBS then
9   contracted with Wilhelmsen.  Wilhelmsen used somebody else to
10  deliver, Sumitomo delivered to the ship, UBS contracted with
11  the vessel owner, Wilhelmsen was in the middle without either
12  of those relationships.  They would not get a maritime lien
13  under the cases cited by Wilhelmsen in his opposition brief,
14  they should not get the benefits of a maritime contract in
15  connection with the Rule B attachment.
16       They also cited Trans Tech, which is a whole series --
17  there was three Trans Tech decisions coming out of the Northern
18  District of California for the premises that this is another
19  bunker brokering claim where the Court granted admiralty
20  jurisdiction.  Yes, it was a bunker broker in claim.  The idea
21  that because that court extended admiralty jurisdiction you
22  should extent admiralty jurisdiction to this contract is
23  completely facile and a completely inaccurate analysis.
24       In Trans Tech the bunker broker had contracted
25  directly with the vessel owner.  The litigation occurred when

11

79otwila                    Argument

1    the bunker broker arrested a ship, a totally different
2    procedure, and alleged in personam claims against the vessel
3    owner arising out of unjust enrichment principles of law.
4    Those were the claims on which the court did its analysis as to
5    whether or not this was admiralty jurisdiction.  There no
6    question that was there a contract between two middle men that
7    would or not be a maritime contract such as there would be
8    admiralty jurisdiction.  Trans Tech has no relevance, your
9    Honor, other than the fact it's another litigation that came
10   out of these bunker broker cases.
11            There was one attachment case relied upon by
12   Wilhelmsen in its opposition brief, and that is the Gulf Marine
13   and Industries Supplies v New Filipino.  And in that case the
14   provider of necessaries to the ship who had a contract with a
15   middle man was found to have a maritime contract.  Of course,
16   that's consistent with UBS's position here, your Honor, because
17   the provider of necessaries in that instance provided them to
18   the ship.  Sumitomo would like to have a maritime contract,
19   your Honor, they provided marine fuel oil to the ship.  So the
20   Gulf Marine case does not cover the circumstances we have where
21   you've got a pure middle man; not contracting with a vessel
22   owner, not contracting or providing services directly to a
23   ship.
24            Wilhelmsen has taken the position that the contracts
25   are back to back and they're obligated just like Sumitomo, or

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

12

79otwila                Argument

1   Sumitomo is a subagent and somehow the Exxon case makes it
2   completely irrelevant whether or not they have a personal
3   relationship with the ship owner or an interaction with a
4   vessel.  And I suggest to you if you take a look at the
5   document they have tendered as an example of the contract, it's
6   not at all that clear.
7        It is my client's position the services provided by
8   Wilhelmsen were twofold.  One was an introduction to Sumitomo.
9   And when you look at that piece of paper that is supposed to
10  set forth the obligations of the various parties as to what
11  went on here, Sumitomo is very clearly identified as a
12  supplier.  It's perfectly clear that Sumitomo was going to
13  deliver.  It's not perfectly clear that Wilhelmsen has delivery
14  obligations.
15       Certainly there's arguments to be made -- if I were
16  the attorney on the other side I would be able to make the
17  argument that it was Wilhelmsen subcontracted to Sumitomo, but
18  I don't think that piece of paper is at all clear and could be
19  argued both ways.  I don't think it's adequate to bear the
20  burden of proof that falls on the shoulders of Wilhelmsen.
21       THE COURT:  But the burden of proof, as I understand
22  it in these proceedings, is to have pled a prima facie case,
23  not to have actually proved.
24       MS. VAN HEMMEN:  Certainly not to prove, but in this
25  hearing here today, your Honor, they do have the obligation of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

13

79otwila                    Argument

1    establishing to you good cause for the allegations they made.
2    This contract makes perfectly clear the entity that is going to
3    deliver that marine fuel oil is Sumitomo, it doesn't make --
4          THE COURT:  Going to deliver it, but the seller is
5    Wilhelmsen.
6          MS. VAN HEMMEN:  Correct.  Conceded, your Honor.
7    Wilhelmsen sold it, that was a mechanism, it was set up as a
8    contract of sale.  It was a mechanism, your Honor, to allow
9    Wilhelmsen to finance the deal.  And I don't believe these
10   parties can confer the admiralty jurisdiction of this case by
11   themselves by the virtue of what they call their deals as
12   opposed to -- and really this gets back to the heart of the
13   Exxon case -- what the courts are calling -- what the Supreme
14   Court is calling on the District Courts to look at, to look at
15   what really is happening under these contracts.  Not what
16   they're being called, not some technical requirement if you
17   call it a sale then you provided necessaries, but if you call
18   it consulting services it's something else.
19          Look at what really happened.  Wilhelmsen sat in an
20   office.  They provided the means for Sumitomo to act.  Sumitomo
21   wouldn't act based on a verbal commitment from a stranger.
22   Sumitomo would act, they would deliver the marine fuel oil.
23   That's the maritime function.  Sumitomo did it, and they
24   wouldn't do it until Wilhelmsen promised to pay.  It's simply a
25   financing arrangement, your Honor.

14

79otwila            Argument

1        THE COURT:  I hear you saying that then I look at the
2    name of your client.  The name of your client is not Wilhelmsen
3    Bunker Brokerage, it's not Wilhelmsen Middle Man Services, it's
4    Wilhelmsen Premiere Marine Fuels, which sounds to me like a
5    company that provides marine fuels, and it has to obtain those
6    from somewhere.
7        But there is no contract between Sumitomo and UBS
8    incorporating the terms of Sumitomo's general conditions into
9    the contract between UBS and Wilhelmsen.  As I understand
10    contract law, which is something I do know something about -- I
11    don't know anything about admiralty but I do know something
12    about contract law -- and it seems to me under elementary
13    contract law principles that means that you two guys have
14    agreed to make yourselves subject to Sumitomo's terms and
15    conditions but the contract is still between you.
16        MS. VAN HEMMEN:  I'm not at all sure, your Honor, that
17    that statement "delivery will be made in accordance with
18    supplier's terms and conditions" in a document that identifies
19    three players, not just two, a seller, a supplier and a buyer,
20    that a statement that delivery, one precise portion of the
21    undertakings done according to supplier's terms and conditions
22    in fact would be read to mean the contract is governed in whole
23    by Sumitomo's terms and conditions.
24        THE COURT:  I agree with you.  I agree with you as a
25    matter of reading the contract.  But that being so, then this

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

15

79otwila                    Argument

1   is the contract and the fact that Sumitomo's name appears on
2   this contract doesn't make it any less a contract between your
3   client and --
4           MS. VAN HEMMEN:  But it does, your Honor, make it very
5   evident that Wilhelmsen isn't going to do the thing that
6   relates to the trafficking of vessels.  The contract itself
7   makes it perfectly evident --
8           THE COURT:  That Wilhelmsen is going to get the oil
9   from someplace else.
10           MS. VAN HEMMEN:  That a third party is going to bring
11  its tug and barge alongside.  In fact, your Honor, there is
12  also a statement in Wilhelmsen's memorandum of law, or it might
13  be an affidavit from either Attorney Frevola or Hans Borge, in
14  any event where they talk about they identify this as the
15  Wilhelmsen UBS contract and then they say and there's also a
16  Wilhelmsen Sumitomo contract.  But nowhere in their papers,
17  your Honor, is the Wilhelmsen Sumitomo contract attached to an
18  affidavit delivered to this Court.
19           I think the reason is that this piece of paper in fact
20  is the contract between all three parties, and I think this
21  email, if you see the way it's sent, it goes to USS UBS.  It's
22  from Wilhelmsen, but if you look at the introductory sentence,
23  "Acting in accordance with instructions from buyers, we confirm
24  our verbal order and nominate as follows."  I suspect that that
25  precise email is sent directly to Sumitomo thereafter, that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

16

79otwila                Argument

1    this is not only the contract between USS and Wilhelmsen but
2    also Wilhelmsen and Sumitomo.
3           Which to me, your Honor, if I were litigating exactly
4    what the obligations are under the contract, I would argue that
5    Sumitomo perhaps alone has the obligation to deliver.  If I
6    were Wilhelmsen's client and there had been a failure to
7    deliver, which there wasn't, but then you might have a maritime
8    case, but if there had been -- I think there's an argument to
9    be made this is a contract with three parties and it's Sumitomo
10   who doing the maritime component of it.
11          But in any event, whether you find that compelling or
12   not, I'm not standing in the shoes to do that, I am trying to
13   bring to the Court's attention that if you look through the
14   structure that the attorneys would like you to see this
15   contract having because it suits their analysis, if you look to
16   in practice with what the parties do, you will see Wilhelmsen
17   was very distant from the trafficking of vessels.  UBS was
18   making undertakings to ship owners.  Sumitomo was, Wilhelmsen
19   wasn't.
20          There was a lot of paper submitted to the Court having
21   to do with the underlying dispute.  While the nature of the
22   dispute has relevance under the Second Circuit's threshold
23   inquiry, I believe that the presentation made by Wilhelmsen
24   went well beyond a discussion of the nature of the dispute.  It
25   appears to attempt to fully educate the Court on the merits and

17
79otwila                Argument
1  give the impression that it was not a dispute that had merit
2  and perhaps even a sort of --
3       THE COURT:  But you should not worry about that.  I
4  wouldn't worry about that.  I have this ability, from years of
5  having too much to do and not enough time, to focus on what's
6  really at issue here.  And what is really at issue here is is
7  there a maritime contract or not.  That is really the principal
8  issue.  And then there's a secondary issue about Rae Corp., and
9  as we all know there is not an issue, as far as I'm concerned,
10  about Winter Storm because I'm just a District Court.
11       MS. VAN HEMMEN:  Understood.  So I would say simply,
12  your Honor, that most of the materials put before the Court on
13  the issue of the underlying dispute, we're here to say, first
14  of all, and that all they ultimately establish --
15       THE COURT:  I don't care about that dispute, I'm
16  really not interested in it, it has nothing to do with me.  I'm
17  trying to tell you I'm not paying any attention to that.
18       MS. VAN HEMMEN:  I'll move on.  Rae Corp. --
19       THE COURT:  I understand why they did it, they did it
20  because your client said they hadn't been paid, but --
21       MS. VAN HEMMEN:  And they tried to create the
22  impression that they had.
23       THE COURT:  It's none of my business.
24       MS. VAN HEMMEN:  If you don't care then I'm not going
25  to address it.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

18

79otwila                Argument

1    THE COURT:  It's none of my business.  There is no
2    such lawsuit before me.
3    MS. VAN HEMMEN:  Okay.  Then I move on, your Honor, to
4    the standard of proof relevant here today for maintaining the
5    cause of action against Rae Corp.  Rule E itself has built into
6    it a heightened showing by virtue of the fact that there is the
7    post attachment arrest -- excuse me, the post attachment
8    hearing, and that heightened scrutiny is necessary, your Honor,
9    because of the extraordinary powers that Rule E gives birth to.
10    And so in this case we sit here based on Wilhelmsen's
11    perception of having been aggrieved and the funds of my client
12    are soaked up to the tune of a million dollars, and they're
13    hoping to get more, so the consequences are extreme.
14    They have done it now not only with their contracting
15    partner but also with an apparent affiliate bringing these two
16    closely related companies to their knees based on what they
17    think they might find, that they don't know it to be the case,
18    your Honor, and what they have observed are benign facts.
19    There's nothing illegal, there's nothing fraudulent, there's
20    nothing dominating about one man being the director of two
21    companies, about those companies sharing the resource of a
22    place, of a telephone number, these things, there's nothing
23    fraudulent about it.
24    And the reason I say fraudulent is, as you know, the
25    standard of proof in New York is you would have to show such a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19

79otwila                    Argument

1   domination and/or fraudulent acts before they would be entitled
2   to the type of relief that they are seeking.  But in the
3   meantime, they have been, based on really what amounts to
4   speculation, in a position to bring the company, this other
5   affiliated company to its knees.
6         There is a lot of case law that supports a finding
7   that the showing has got to be greater, it's got to be beyond
8   simple allegations in the pleading, and I don't think that they
9   have made the adequate showing.  And I would ask the Court, in
10  the light of the extraordinary power of these attachments,
11  insist on the heightened standard, and under that heightened
12  standard I say that the case has not been made and it should
13  be -- the attachment based on it should be vacated.
14        The only thing I would like to add about EFTs, your
15  Honor, I don't want waste anybody's time, however a nuance that
16  we have not discussed a way through it that another District
17  Judge here in the Southern District has seen to be appropriate
18  was limiting the application of the Winter Storm decision to
19  the very specific facts of that case, and that is to EFTs
20  transferred from defendants to third parties but not permit the
21  attachment of EFTs from third parties to defendants.
22        And given the question --
23        THE COURT:  Though it's interesting to me, if you were
24  going to try to limit the idea of Winter Storm, it would make
25  much more sense to limit the transactions the other way,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

20

79otwila                    Argument

1  because the money that's coming into your bank account is more
2  your money than the money that is going out of your bank
3  account to pay somebody else.
4         MS. VAN HEMMEN:  I saw the equities of that and I had
5  that thought process myself, your Honor.  However, I don't
6  think it's an equitable argument, I think it's a legal,
7  technical argument that one judge felt was the way through the
8  quandary that the District was given in the Winter Storm
9  decision, but the feeling that perhaps another panel or the
10  Second Circuit en banc would not have followed and the guidance
11  that the Court seems to be trying to give in the way of
12  footnotes and what have you, and I ask that this Court be
13  similarly guided.
14         THE COURT:  And the decision again, you're talking
15  about Judge Rakoff's decision.
16         MR. FREVOLA:  Seamar, your Honor.
17         MS. VAN HEMMEN:  And your Honor, I think everything
18  else was in the brief.  And so I don't want to simply recite
19  the same things over and over again.
20         THE COURT:  The briefs were obviously extremely
21  helpful.
22         MS. VAN HEMMEN:  I'll sit until your Honor has a
23  question for me.
24         THE COURT:  Okay.  Mr. Frevola.
25         MR. FREVOLA:  Yes, your Honor.  Thank you.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

21
79otwila                    Argument

1          Your Honor, I after seeing the reply brief of opposing
2   counsel I actually looked a look at a couple of things to try
3   to help clarify this.  And something that actually is very
4   helpful in clarifying, your Honor, is a District Court decision
5   in the Exxon case itself, the one that was appealed up to the
6   Supreme Court.  And I have copies, if I may bring one up, your
7   Honor, I have one for opposing counsel as well.
8          This is the first one.  I have also got the
9   reconsideration document there because there's one little bit
10  in the reconsideration as well.  But there is a very
11  interesting series of facts and also arguments made by the
12  opposition which ultimately the Supreme Court found to be not
13  compelling.
14         If you look at page 2 of the first decision, the
15  second paragraph -- sorry, the second column, first full
16  paragraph about halfway down, it says in return for Exxon's
17  services, Arabian Marine, which is the actual physical
18  supplier, agreed to pay Exxon a commission, i.e. like a broker.
19  As opposed to where you have multiple contracts, it was
20  actually a commission based apparently on a percentage.
21         Also the next sentence --
22         THE COURT:  I had understood that where Wilhelmsen
23  took its profit in this whole crazy arrangement was on the
24  spread between the price at which it bought from Sumitomo and
25  the price at which it sold to you.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

22

79otwila                 Argument

1          MR. FREVOLA:  There was a mark up.  It was not a
2    standard mark up.
3          THE COURT:  In other words, no commission was being
4    paid.
5          MR. FREVOLA:  No, your Honor.
6          THE COURT:  No commission was being paid, this was an
7    arbitrage.
8          MR. FREVOLA:  It was a mark up, your Honor.  And
9    wasn't a standard mark up, it changed depending on what the day
10   was.
11         THE COURT:  It was an arbitrage based on the existing
12   market for fuel oil on that day, but there was a spread and
13   that spread stayed in Wilhelmsen's pocket.
14         MR. FREVOLA:  And in their favor as well.  But your
15   Honor, one of the things that I would like to point out is
16   while they arranged for a physical supplier to do this, in
17   event that something happened here -- in the Asian rim, if an
18   earthquake happened in Japan, which is not unforeseeable, and a
19   Tsunami damaged Tokyo Bay and Sumitomo is not able to perform,
20   at that juncture Wilhelmsen is trying to find the stuff himself
21   or bring in the bunkers from Korea or in the Chinese mainland
22   to fulfill its obligations or they're liable.
23         THE COURT:  Your position is they're not simply an
24   intermediary, they agreed to supply you, you couldn't care less
25   where they get the stuff.  It could come from Sumitomo, it

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

23

79otwila                Argument

1    could come from Aramco, it could come from Marathon Oil.  You
2    don't care where it comes from as long as -- and the Navy
3    certainly doesn't care where it comes from as long as it gets
4    into the ship.
5           MR. FREVOLA:  And I think taking it a step further,
6    there's a distinction that I think also comes to the play in
7    the charter party context, and I think it helps clarify this
8    situation versus a brokerage situation.  Charter brokers will
9    take a ship owner and wed them up with a chartering.  There's a
10   different situation, however, that occurs and that's called
11   subcharters where someone -- again they arbitrage essentially,
12   they wind up time chartering a vessel or voyage chartering a
13   vessel but then flip it around and do a back-to-back charter
14   party with third party under another separate document and both
15   of those documents are maritime contracts.  I think that my
16   colleague here would agree to that.
17          In the charter broker situation, when the charterer
18   pays the ship owner for the charter hire, 1.25 percent of that
19   gets paid to the broker because there's a contract between the
20   two end parties and the broker gets their commission.  Here not
21   only were there two separate parts but Wilhelmsen has paid
22   Sumitomo under that other contract.
23          Now there was a mention in terms of the contract that
24   governs Sumitomo and Wilhelmsen in terms of their agreements.
25   Their agreement likewise is the Sumitomo --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

24

79otwila                Argument

1          THE COURT:  I'm not particularly interested in that
2    agreement, I'm interested in the agreement between -- the
3    agreement pursuant to which this nomination took place, and I'm
4    becoming increasingly comfortable because as I'm sitting here I
5    remember that the last case that I tried before I went on the
6    bench was on behalf of a long-time client Northville
7    Industries.  We all know what business Northville Industries
8    was in, it was the fuel business, and was a middle man.  And
9    Northville would have a contract with a client pursuant to
10   which contract it would nominate someone to do something.
11         Now there's an earlier contract than this, I take it
12   it's an oral agreement.
13         MR. FREVOLA:  Yes, your Honor.
14         THE COURT:  I have no evidence about it, there is no
15   evidence about it in the record, nothing.
16         MR. FREVOLA:  That would be a recap --
17         THE COURT:  No, no, no, nobody has testified to the
18   conversation that gave rise to the agreement pursuant to which
19   his nomination was made.  It's likely forgotten about.
20         MR. FREVOLA:  Your Honor, I believe that Mr. Borge's
21   name is on that recap.
22         THE COURT:  His name is on the recap.
23         MR. FREVOLA:  And he put an affirmation in here, your
24   Honor, and in paragraph 5 of his affirmation it says each time
25   UBS contacted Wilhelmsen to bunker a nominated vessel

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

25

79otwila              Argument

1  Wilhelmsen replied with an email confirming the agreement.
2          THE COURT:  Let's go back.  Paragraph 4, Wilhelmsen
3  entered into a series of agreements with UBS to provide vessels
4  nominated by UBS with bunkers in the ports of Sasebo and Naha
5  in Japan.  Before any of those nominations took place there had
6  to have been a conversation between somebody at Wilhelmsen and
7  somebody at UBS, and it's that conversation it seems to me that
8  sets up the --
9          MR. FREVOLA:  Your Honor, I think --
10          THE COURT:  -- that's integral to the agreement.
11          MR. FREVOLA:  The affirmation may be a little inartful
12  in that the next paragraph, the following paragraph explains
13  how the email came about.  It came after Wilhelmsen was
14  contacted by UBS to confirm the agreement that was reached by
15  contact.  I suspect it was either telephone or email.  I didn't
16  get that from Mr. Borge directly, I didn't develop that
17  information, but it was a recap of the contact saying we will
18  do what you asked us to do.
19          Your Honor, there's one more section of the Exxon
20  District Court opinion which I thought was very helpful, it's
21  the second full paragraph on page 5, left-hand column, and
22  starting with the second sentence of that paragraph, I'll read
23  it.  It's, meaning Exxon, Exxon Services, with respect to the
24  Jedda delivery, included taking Waterman's order, contacting
25  Arabian Marine, who was the local physical supplier,

26
79otwila                Argument
1    maintaining a bunker's contract with that physical supplier,
2    Arabian Marine, and advancing Waterman the purchase price by
3    paying Arabian Marine.  All which happened here, your Honor.
4         THE COURT:  It never actually possessed the fuel.
5         MR. FREVOLA:  And never had the title to the fuel in
6    that case.  Here at least they had title.  It never actually
7    possessed the fuel.  Indeed, pursuant to Exxon's contract with
8    Arabian Marine, title to the fuel passed directly from marine
9    to the hooper, which was the vessel.  In return for these
10   services, Exxon received a commission which was deducted from
11   Arabian Marine's invoices to Exxon.  In sum Exxon's rule in the
12   transaction was strictly "shore side."  This what the District
13   Court held here similar to my opponents arguments here today.
14        And on these facts, your Honor, I submit this sounds
15   more like a brokerage contract than ours.  The Supreme Court
16   says it was a maritime contract because Justice Marshall
17   understood you can't look at one and say it's maritime and
18   another and say it's not.
19        And also significantly, your Honor, do you see the
20   reference to the financing?
21        THE COURT:  Yes.
22        MR. FREVOLA:  The whole reason that Exxon got back
23   involved in this, if you read this opinion, Exxon was doing it
24   locally, Arabian Marine started giving discounts to its
25   customers that Exxon couldn't agree, so they got out of the
                SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

27

79otwila                Argument

1   loop and as a courtesy they kept in the loop helping to
2   facilitate these nominations.  But eventually --
3           THE COURT:  So they didn't get out of the loop.
4           MR. FREVOLA:  But they weren't actually contractually
5   bound, were just acting --
6           THE COURT:  You mean they were no longer supplying out
7   of their own reserve.
8           MR. FREVOLA:  Precisely.  And no longer paying ahead
9   of time.  There came a point where Waterman had problems
10  financially, so Arabian Marine said we're not going to do this
11  with them anymore unless someone can essentially stand up for
12  them financially, and that's when Exxon got in.  If this is the
13  financing issue, the Supreme Court has said financing is fine
14  by the Supreme Court, your Honor.  So that's the facts of the
15  Exxon decision.
16          And turning to the U.S. Supreme Court Exxon decision,
17  your Honor, this goes to the issue of this maritime lien
18  question versus maritime claim.  And as an issue in fact, your
19  Honor, I submit to you that the mere fact that Rule B exists
20  means that not only maritime lien claims are maritime but there
21  are other maritime claims out there that are maybe not worthy
22  of a lien but nevertheless fall within the admiralty
23  jurisdiction, and that's what we're talking about today.
24          In Wilhelmsen's case there could not be a lien on this
25  vessel.  And there's a simple reason why.  There's a statute

                    SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

28

79otwila                    Argument
1    called the Public Vessels Act.  Because of that, if you're
2    dealing with a U.S. government vessel there is no right to a
3    lien against the vessel.  You can't arrest it.
4              In the Exxon case --
5              THE COURT:  I'm shocked, shocked.
6              MR. FREVOLA:  In the Exxon U.S. Supreme Court case,
7    the question before the U.S. Supreme Court was not whether
8    there was a lien.  Indeed, one of their last sentences in the
9    decision they say we express no view on whether Exxon is
10   entitled to a maritime lien under the Federal Maritime Lien
11   Act.  The issue is not before us and we leave it to be decided
12   on remand.
13             What they say further up in the same paragraph, like
14   the District Court we believe it is clear when Exxon directly
15   supplies and refuels Waterman ships the arrangement is maritime
16   in nature.  In this case the only difference between New York
17   delivery over which the District Court asserted jurisdiction
18   and the Jedda delivery is that in Jedda Exxon bought the fuels
19   from a third party and had the third party deliver them to the
20   vessel where in New York they did it themselves.
21             And your Honor, here again, if there was a brokerage
22   situation where there was a charter party and they received a
23   commission, I would say maybe you have a situation where it's
24   not a maritime contract.  In the fuels industry, your Honor, my
25   opponent here has not given one single case where a fuel
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

29

79otwila                    Argument
1   brokerage contract or agreement is non-maritime.  There are
2   cases where it was found not to be a maritime lien, but there's
3   a reason for that.  A maritime claim only needs necessaries
4   applied to the vessel, two elements.  They get that lien, you
5   need the third element, which is basically at the order or the
6   authority of the owner.  And that's why the Gale Head decision,
7   your Honor, is so important.  Because the 11th Circuit in Gale
8   Head essentially said everyone agrees on this.  The first two
9   elements are -- there's no question it was done.
10      And that's why, your Honor, I cited this Gulf Marine
11  New Filipino case, because it's one -- there's not many out
12  here, your Honor, I looked and actually found another one,
13  which I'll cite to you in a second, but Gulf Marine is very
14  handy case, because Gulf Marine involves a situation where
15  neither the vessel owner nor the vessel charter ordered the
16  supplies.  They actually got an agent to do it for them,
17  similar to UBS.  And that agent went out, the agent's name was
18  New Filipino, New Filipino winds up going out and getting
19  somebody to procure supplies for the vessel, just like
20  Wilhelmsen here.
21      Now in New Filipino it wasn't done by a subcontractor
22  of the plaintiff, the plaintiff themselves actually did perform
23  the contract.  But what's important here is that the Court
24  found that this provision of services to the vessel at the
25  order of a general agent was sufficient to create a maritime

30

79otwila                    Argument

1   claim even though it wasn't provided at the order of the
2   vessel's owner or the charterer, it was somebody said please
3   provision this vessel
4           THE COURT:  What's the citation of that case?
5           MR. FREVOLA:  That case is not reported in the Federal
6   Reporter, it's 2001 Westlaw 277924 (Eastern District of
7   Louisiana, 2001), Westlaw pages 3 and 4 are important.
8           Let me say the Court finds that the plaintiffs have
9   satisfied the requirements establishing that the claim is
10   maritime in nature as it concerns the furnishing of necessaries
11   to a vessel.  Just like in Gale Head where they say that the
12   first two items, necessaries to the vessel, were satisfied.  I
13   mean this is something that you'll see in all these cases.  One
14   of the reasons why there isn't much case law on this is because
15   I think it's pretty well accepted.
16           I have another case, a 9th Circuit decision that talks
17   about a close analogy as well.  And when I saw that the New
18   Filipino case was being challenged by my opponent's reply
19   brief, I went out and got you another one.  It's called Hinkins
20   Steamship v Freighters, Inc.  This one is nice and short, your
21   Honor, it's so short in fact that if you take a moment to read
22   the first four paragraphs of the case, your Honor, you'll see,
23   I think -- I'll explain the related parties afterwards, but
24   it's pretty short and sweet.
25           THE COURT:  Okay.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

31

79otwila                    Argument

1         MR. FREVOLA:  Now your Honor, here the vessel owner
2    essentially or the charterer of the vessel was Freighters Inc.
3    Freighters Inc. had an agent, again like UBS, which is Bulk
4    Food.  So it wasn't the vessel owner or vessel charterer but an
5    agent for them or a contractor, an independent contractor of
6    them, Bulk Food, who asked for the provision of the
7    necessaries.
8         And in this case, your Honor, the person who was asked
9    to provide the necessaries did not provide those necessaries
10   themself.  They actually went out and got other people to
11   provide them, and the defendant said that's not a maritime
12   claim, they don't do anything themselves.  And in the 9th
13   Circuit again, 30 years ago, said of course it is.
14        So I can keep trying to find more precedent in this,
15   your Honor, but think in the fuel context -- there is no
16   question that in fuel context there are multiple tiered
17   contracts, and the Supreme Court looked at this and said
18   they're maritime contracts.
19        In terms of the issue of farming out the
20   responsibility, so long as there an obligation contractually
21   you have to provide something that puts you inside the maritime
22   context.  It's not as if you're trying to procure a maritime
23   contract if you have the obligation yourself.
24        And your Honor, in our brief actually we talk about
25   that.  There's, for example, in a financing or a guarantee

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

32

79otwila               Argument

1   situation, a guarantee of payment in the event a principal
2   winds up defaulting on the contract it's not maritime.  But if
3   you guarantee to perform the contract if there's a default, it
4   is.  Here Sumitomo wasn't able to perform, it fell back on
5   Wilhelmsen.  I mean Section 2 of the Sumitomo terms talk about
6   delivery.  They talk about the obligation to deliver by or
7   within a period stipulated, Section 2.1.
8        Few more items, your Honor, and I think I will have
9   covered it all.
10       THE COURT:  I'm not sure what point you were just
11  trying to make.
12       MR. FREVOLA:  2.1 says --
13       THE COURT:  The obligation of seller and seller here
14  is Sumitomo.
15       MR. FREVOLA:  Your Honor, for the adopted -- for the
16  nomination, the seller is Wilhelmsen, they're seller on the
17  nomination in the email.  So they have the obligation to
18  deliver by or within a certain time, be it from Sumitomo --
19       THE COURT:  See, I don't think that's correct.  This
20  is a contract between Sumitomo and somebody, and in this
21  contract Sumitomo in this document, Sumitomo, not anybody else,
22  is identified as seller.  So every reference in this piece of
23  paper to seller is to Sumitomo.  It's not to the person who has
24  been nominated the seller in some other agreement that says
25  delivery will be made in accordance with the supplier's terms

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

33

79otwila                    Argument

1    and conditions.  This just says this is how Sumitomo is going
2    to deliver to UBS.
3            MR. FREVOLA:  But your Honor, what relevance would
4    that have with regard to -- if the contract is not something
5    that would bind UBS, what relevance would that have other than
6    we're referring to those terms as the remainder of the terms?
7    This is an industry practice.
8            THE COURT:  I hear you, I understand, but that doesn't
9    mean that I can read this contract and substitute the word
10    Wilhelmsen for the word Sumitomo next to the parenthetical that
11    says seller.  That is not what it means when it says delivery
12    will be made in accordance with the supplier's terms and
13    conditions.  The supplier's terms and conditions are that
14    Sumitomo obligates itself to deliver the goods specified on
15    something of the face of the sale -- I can't even read that --
16    a purchase agreement between the seller and buyer by the time
17    or within the period stipulated on the face of the contract.
18            MR. FREVOLA:  Even so, if that's the case, your Honor,
19    still the email itself talks about, for example, in this case
20    March 26 they are going to be delivering 2,130 metric tons of
21    fuel oil to that vessel, and if they couldn't get it from
22    Sumitomo they would have to get it from somewhere.
23            In terms of a couple other things here, your Honor,
24    the issue about Wilhelmsen being in a remote office and not
25    being down there on the piers or operating the terminal

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

34

79otwila                Argument

1   equipment, that type of thing, that isn't the nature of the
2   maritime business today in many aspects.  The charter
3   subcharter example I gave your Honor where two back-to-back
4   charters occur, a couple weeks ago I was at an office of one of
5   our clients that does that very thing.  And I walked in, your
6   Honor, there are computer screens, people on the phone and they
7   are a ship owner, but the only thing they have is an office
8   with people doing the operations and doing the work from their
9   desk managing the day-to-day operations, or in the case of
10  Wilhelmsen, the management of providing fuel to ships.
11          In the Exxon case, somebody -- actually the Court
12  refers to the fact that Exxon's performance was in the U.S. on
13  the Jedda contract, and nevertheless that performance in the
14  U.S., even though remote and far away, was still found to be
15  maritime.  It's in the Exxon decisions.
16          And one other case in terms of the preliminary
17  contract doctrine, and also this issue of being an actual
18  person bound to perform versus a person who is not bound to
19  perform in a maritime contract, I think the late Judge Casey's
20  decision in Sea Transport Contractors lays it out very well in
21  terms of distinction, and he makes that point very well, and I
22  commend it to you.
23          THE COURT:  Let's talk about Rae Corp.
24          MR. FREVOLA:  Yes, your Honor.
25          THE COURT:  So we're at a hearing, we're beyond the
                  SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

35

79otwila              Argument

1    pleading stage, we're at a hearing.  What is your obligation at
2    this point under the Admiralty Supplemental Rules?  And I ask
3    this question because I wonder what happens to these
4    proceedings.  Somebody comes in and somebody gets an
5    attachment, somebody else comes in and says the attachment
6    should be vacated.  The attachment is provisional remedy, and
7    you vacate or don't vacate.  If you don't vacate the attachment
8    you don't dismiss the proceeding.
9          When does this proceeding go away?  What is the
10   ultimate adjudication here?
11         MR. FREVOLA:  Typically what happens is one of several
12   things, your Honor.  If there is no jurisdictional clause or
13   the parties waive arbitration, obviously it goes forward here.
14         A lot of times what happens is there --
15         THE COURT:  You mean the underlying dispute?  There's
16   no claim here for the underlying dispute.  That would be a
17   different lawsuit.
18         MR. FREVOLA:  Again, your Honor, unless we decide to
19   waive going to arbitration, because we did bring this as a
20   complaint and said that there is this limited arbitration
21   clause.
22         Again one of the things that made us discuss this was
23   the question at the last court conference both my opponent and
24   your Honor yourself both raised this a very strong objection to
25   the idea there was an arbitration clause here.  Now in terms of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

36
79otwila                Argument
1   rather than fighting that issue out, it seemed to make sense to
2   essentially say we'll go forward here and waive any arbitration
3   right we have.
4        THE COURT:  And you would then serve an amended
5   complaint that asserted not your claim for attachment, that is
6   all you asserted here, but it would be your intent to serve an
7   amended complaint to bring in the proceeding?  The proceeding
8   here is for a remedy of provisional remedy, an attachment,
9   that's all.
10       MR. FREVOLA:  But your Honor, you can do that -- I
11  don't believe that there would need to be an amended complaint,
12  your Honor, only because --
13       THE COURT:  Well, I'm telling you there would have to
14  be.  Because this complaint says you actually don't have any
15  jurisdiction over the underlying dispute, but we're coming to
16  you for an attachment, for injunction in aid of arbitration.
17  No claim is made in the amended complaint for the underlying
18  relief because as of the time that the amended complaint was
19  filed you were going to London to get your underlying relief.
20       So yes, you would have to amend the pleading.  But if
21  you say go forward in New York, it would be your intention that
22  the underlying dispute be litigated here in the ordinary
23  course, and at the end you would win or lose and the attachment
24  would be vacated or you take the money.
25       MR. FREVOLA:  Exactly.
                SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

Case 1:07-cv-05798-CM-HBP     Document 27-7     Filed 10/08/2007     Page 38 of 58

37

79otwila                    Argument

1          THE COURT:  And if one were to go forward in London,
2     the attachment would continue into such time as the London
3     arbitration had concluded and there would undoubtedly be a
4     motion by someone to confirm the arbitration award which would
5     probably be here because here's the money.
6          MR. FREVOLA:  But in the Ulysses Shipping case before
7     Judge Scheindlin a little less than two years ago, Mr. Lennon
8     and I wound up escrowing the money after having our 4F hearing,
9     and essentially it's been drawn partially.  We're waiting for a
10    cost award in England to resolve the rest of it.  But escrowing
11    the funds are also another option that happens relatively
12    frequently.
13         THE COURT:  Okay.  Is this a Rule E case?
14         MR. FREVOLA:  Well, Rule E4F is the hearing we're
15    having here, your Honor, that's what they call it.  It's the
16    prompt hearing to see if we can vacate the attachment.
17         The question about Rae Corp. and what governs, what
18    standard governs.  The assertions against Rae Corp., your
19    Honor?
20         THE COURT:  Yes.
21         MR. FREVOLA:  I'm actually -- I am getting ready to
22    argue that in front of Second Circuit.
23         THE COURT:  I see.
24         MR. FREVOLA:  So I'm relatively familiar with that
25    issue.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

38

79otwila                Argument

1          THE COURT:  You're certainly familiar with your
2    position on the issue.
3          MR. FREVOLA:  I'm familiar with both, actually, your
4    Honor.  And I would submit to your Honor, either way I think we
5    have met our standard.  The initial standard or the one that I
6    think is being espoused by a lot of District Courts right now,
7    including Judge Wood in Tide Line, wind up saying that all that
8    has to be alleged is a prima facie admiralty claim.  And that
9    very well --
10          THE COURT:  Rae Corp. -- there is a contract with Rae
11    Corp.  I want to know what you have to prove to get this
12    attachment extended to a party who you claim in very conclusory
13    terms is an alter ego.
14          MR. FREVOLA:  Well, your Honor, I think that again a
15    lot of the decisions say all you have to do is allege it.
16          THE COURT:  I find that offensive.
17          MR. FREVOLA:  So do I, your Honor.
18          THE COURT:  So let's assume that I'm not one of the
19    District Courts who says that.
20          MR. FREVOLA:  Why are we having this hearing if not
21    for having to prove something else.  I agree with you.  So even
22    prima facie admiralty claim is a lot of what these decisions
23    say.  I don't think that --
24          THE COURT:  So prove it.
25          MR. FREVOLA:  The other standard is the reasonable
                    SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

39

79otwila                Argument

1   ground standard, your Honor.  And the reasonable ground
2   standard essentially says you don't have to show fire but we
3   want to see some smoke.  And in the Ulysses case, going back to
4   that one, that involved three separate entities of the Fal
5   Group which was a United Arab Emerits series of companies.  And
6   I was representing the defendant, the Fal Group, and my
7   adversary had filed a complaint saying they were all alter
8   egos.
9        It was a rather conclusory complaint, it didn't
10  include offices, telephone numbers, intertwined email
11  addresses; the fact on the advertisement for Rae Corp. it says
12  Rae Corp. uses UBS USS's terms and conditions, referring to its
13  other company, using the Rae Corp. emails for UBS business,
14  things like that.  But on top of that, your Honor, we also, as
15  you know from the last hearing, we intercepted a payment made
16  by Rae Corp. to pay the counsel bills of UBS.
17       In Ulysses Shipping, if you look at that case, the one
18  fact in Ulysses Shipping was sufficient for Judge Scheindlin to
19  hold not own the primary defendant, Fal Shipping, but its
20  affiliate, Fal Oil had paid one hire payment, one hire payment
21  for a vessel that had been charted by Fal Shipping sent by Fal
22  Oil.  And Judge Scheindlin says that's it, I'm seeing
23  commingling, that's all that has to be shown right now, and we
24  have a payment by one company on behalf of another.
25       THE COURT:  Clarify the timing for me.  When did you
                SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

40

79otwila                    Argument

1    file your amended complaint?
2         MR. FREVOLA:  I believe -- actually I have it right
3    here.
4         THE COURT:  I have got received in my chambers
5    August 23rd.
6         MR. FREVOLA:  Yes, your Honor.  Actually --
7         THE COURT:  So when was the payment intercepted?
8         MR. FREVOLA:  I believe --
9         THE COURT:  September something or --
10        MR. FREVOLA:  September 3rd maybe.
11        THE COURT:  So Rae Corp. was a party.
12        MR. FREVOLA:  Yes, your Honor.
13        THE COURT:  So Rae Corp. could have been paying its
14   own legal bills.  Rae Corp. wasn't doing anything on behalf of
15   UBS by advancing that payment, Rae Corp. at this point is a
16   party.
17        MR. FREVOLA:  Well, your Honor, Ms. Van Hemmen at the
18   hearing said the money being sent to her was for previous legal
19   bills incurred for representing UBS, and the night before she
20   had been told that Rae Corp. had this -- she was retained the
21   night before by Rae Corp. after the attachment occurred.
22        THE COURT:  Factually accurate?
23        MS. VAN HEMMEN:  Yes.  I was retained the night before
24   I got to court.
25        THE COURT:  Thank you.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

41

79otwila                Argument

1       MR. FREVOLA:  So your Honor, I would submit that even
2   using a higher reasonable grounds standard under Ulysses
3   Shipping, there's another one called Linea Naviera talked about
4   the same thing in the Southern District of Florida, the Occocra
5   (ph) case, which is the Eastern District of Louisiana.  They
6   talk about not having proved your case but if you do show
7   indicia that's enough.  And I think of we have got past the
8   prima facie case standard to a reasonable ground.
9       Your Honor, I have got the issue on -- I actually got
10  my other brief to Judge Karas on the arbitration thing.  Let me
11  make sure I have answered the last issue here before moving on
12  to The Anaconda.
13      Your Honor, just in terms of the Seamar case, one of
14  the things they talked about in terms of these wire transfers
15  is it's a joint property in interest between the originator and
16  beneficiaries while it's being sent.  That's why both going and
17  coming you wind up having the same problem.  Judge Rakoff did
18  wind up deciding Seamar thinking Aqua Stoli was a harbinger of
19  things to come, and essentially none of his colleagues on the
20  bench in the Southern District have joined that.
21      I think there are about seven or eight cases at least
22  that all afterwards says Seamar just doesn't reflect what the
23  law is right now.  So I submit to you, your Honor, that the
24  great majority of cases here in the Southern District for
25  beneficiary-type attachments rule that Winter Storm is the law
                SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

42

79otwila                    Argument

1    of the Second Circuit.
2        MR. FREVOLA:  On the issue, your Honor, if you could
3    give me a moment to get my bearings on the other brief here.
4        THE COURT:  Sure.
5        MS. VAN HEMMEN:  Your Honor, could I address
6    Mr. Frevola's other remarks?
7        THE COURT:  Well, he's going to want to listen to
8    that.
9        MR. FREVOLA:  Yes, your Honor, thank you.
10        THE COURT:  Let me given him a minute to get his
11    bearings.
12        MR. FREVOLA:  It was The Anaconda, your Honor.
13    Happily I was right.  The cite is The Anaconda v The American
14    Sugar Refining Company, 322 U.S. 42 (1944).  Even got the '40s
15    right.
16        The Supreme Court -- quote from page 45 I think is
17    helpful, I'll read from my brief because I think it's more
18    coherent than trying to find it other way.  On appeal the
19    Supreme Court held that the plaintiff's commencement of the
20    lawsuit to obtain security prior to commencing arbitration was
21    proper and specifically contemplated by the Federal Arbitration
22    Act, and that the Federal Arbitration Act permitted the
23    plaintiff to even forego arbitration if it so chose subject to
24    defendant's right to request arbitration.
25        And the quote from the case is:  Here again the act

43

1  plainly contemplates that one who has agreed to arbitrate may
2  nevertheless prosecute his cause of action in admiralty and
3  protect his opponent's right to arbitration by court order.
4  Far from ousting or permitting the parties to the agreement to
5  oust the court of jurisdiction of the cause of action, the
6  statute recognizes the jurisdiction and saves the right of an
7  aggrieved party to invoke it.
8        And your Honor, I also --
9        THE COURT:  Can you help me out here, tell me what the
10  facts were in Anaconda.
11        MR. FREVOLA:  I have got a copy of the case here, your
12  Honor, give me a moment.
13        Unfortunately, your Honor, there is an incredible
14  amount of detail.
15        THE COURT:  Is it at least possible to say that it's a
16  case in which the attachment was obtained in the manner that
17  you obtained this attachment following which Anaconda or
18  whoever it was never commenced arbitration but instead came to
19  court to litigate the underlying claim?  Are those the facts?
20        MR. FREVOLA:  I would say it's fair to say that they
21  commenced it as a straightforward maritime lawsuit, your Honor,
22  as opposed to saying that there might be an arbitration clause
23  in it.
24        I think there may have been one other case that may
25  have been helpful.  There was a Greenwich Marine Case that was

44

79otwila                Argument

1  decided by the Justice Marshall when he was on the Second
2  Circuit, that's Greenwich Marine Inc. v SS Alexandra, 339 F.2d
3  901 (2d Cir. 1965).
4       One of the things also that Greenwich Marine says is
5  it talks about this issue of not having to have a separate
6  petition to compel arbitration as well as the complaint to file
7  a lawsuit with.  I would think that the liberal pleading
8  requirements, if there was some type of defect that didn't make
9  this plain that we could stay here in New York that would be
10  something where --
11       THE COURT:  At the time that you filed this document
12  you didn't want to stay in New York.  You can't say that you
13  filed this document intending to litigate in New York.  You
14  didn't.  You intended to litigate in London.
15       MR. FREVOLA:  I think point is there is a lot of
16  precedent to say that you can decide to forego that.
17       THE COURT:  Anyone can decide to forego, but what you
18  can't do is not litigate somewhere.  You have to litigate
19  somewhere.  If you have an attachment and I found out three
20  months later that you weren't litigating anywhere I would sua
21  sponte vacate the attachment.  So you have to litigate
22  somewhere.
23       And if it's going to be here, fine, it will get thrown
24  into the mix, it will be litigated as a case in the ordinary
25  course.  You'll have to file a new pleading and your opponent

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

45

79otwila                 Argument

1   has an absolute right to demand arbitration which could set us
2   off in another frolic and detour.
3        MR. FREVOLA:  I would check with her before I file an
4   amended complaint.
5        I believe I answered everything, your Honor.
6   Everything else is in our brief.
7        MS. VAN HEMMEN:  May I, your Honor?
8        THE COURT:  Absolutely.
9        MS. VAN HEMMEN:  On the issue, it appears that The
10  Anaconda -- I don't know it, I haven't read it, it appears on
11  its facts it doesn't govern in this situation.  It seems to me,
12  your Honor, the only issue -- and the issue isn't only whether
13  or not Wilhelmsen really intended to litigate London or New
14  York or someplace else.  It seems to me that there's a very
15  real issue here, given the extraordinary nature of the remedy
16  they have sought here, as to whether or not the verified
17  complaint that supported their seeking of the remedy was
18  correct and true.
19       And after they filed it, they verified it, they put
20  those facts before the Court, they got the remedy.  I'm here
21  preparing for a hearing that I attacked the complaint and the
22  facts and all these other things and over the weekend I find
23  out the facts in the verified complaint are not the facts.  And
24  it seems to me --
25       THE COURT:  Somebody verified this complaint and
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

46

79otwila          Argument

1  somebody committed perjury on that date?

2       MS. VAN HEMMEN:  I'm not saying that.  I believe that

3  perhaps there was a change in the mind.  I'm not suggesting a

4  fraud or perjury, I'm saying that I believe when you get

5  remedies of these kind the facts have to be right.  And if the

6  facts shift in a substantive way -- and this is very

7  substantive, because the basis for coming into Court here to

8  get this attachment here for stems that occurred in Japan

9  pursuant to contracts with an entity in Scandinavia and

10 Australia is because the arbitration act said you can do it in

11 furtherance of arbitration.  Well, they're not doing it in

12 furtherance of arbitration, so off the top of my head --

13      THE COURT:  Do we have jurisdiction over the --

14      MS. VAN HEMMEN:  At least I would be before you on

15 non-forum argument, and that's one example.  I don't know all

16 of other things that --

17      THE COURT:  There could be a motion to dismiss for

18 lack of in personam jurisdiction.

19      MS. VAN HEMMEN:  I think there's a motion to vacate

20 the attachment on the basis the complaint on which it was based

21 it not true and correct and was --

22      THE COURT:  Let's say is no longer true and correct,

23 has become not correct.  I mean yeah, I am sitting here, it

24 occurs to me that if the underlying complaint were brought, I

25 think you have to have in personam jurisdiction --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

47

79otwila                Argument

1       MR. FREVOLA:  Your Honor, if I may.
2       THE COURT:  -- to litigate the underlying complaint.
3       MR. FREVOLA:  You do, but the in personam jurisdiction
4   is granted by the attachment which essentially is a form of
5   quasi in rem jurisdiction.  And we attached to assets, so you
6   do have jurisdiction up to the amount attached.  That's the way
7   the cases --
8       Am I right?
9       MS. VAN HEMMEN:  No.
10      Your Honor, in rem arrests, which is the same type of
11  jurisdiction where the courts historically -- because of the
12  need for maritime commerce for allowing extensions of
13  jurisdiction, in rem arrests are now routinely dismissed on
14  forum.
15      In particular, if you look at all the bunker broker
16  cases, which as you pointed out were all vessel arrests, those
17  cases were willy-nilly being sent away, security was released,
18  the court said there was no connection.  In those cases the
19  courts were saying the fact that the offending vessel, because
20  as you know in the Rule C arrests you have got to get the
21  vessel --
22      THE COURT:  The odds that I would keep this case for
23  the underlying dispute are, I would say, slim.
24      MS. VAN HEMMEN:  So in any event, your Honor, I would
25  ask for leave to make another motion on that basis.  However, I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

79otwila                    Argument

1  think this is a defect in the procedure from the get go and
2  warrants dismissal or granting of the motion to vacate on that
3  the basis alone.
4        A couple of other points I would like to make very
5  pointedly and I won't taken up a lot of time revisiting the
6  issues Mr. Frevola addressed.  There seems to be some confusion
7  about UBS's position of the significance of the Exxon decision.
8  UBS concedes the Exxon decision says that when somebody who
9  furnishes something to a ship does so through an agent that
10  there is maritime jurisdiction over the contract between the
11  furnisher and the ship owner.  I recognize that.  And so I am
12  not here arguing something about commissions or something about
13  the passage of title is what make the different between Exxon
14  and our case.
15        My position distinguishing the Exxon case is simply
16  that Exxon made its promises to a ship operator.  Wilhelmsen
17  made its promises to UBS, not a ship owner.  That's the
18  distinction there.  On the other side, your Honor, there are
19  maritime contracts that spring up like the New Filipino case,
20  and like the case that Mr. Frevola just handed up, the Hinkins
21  case, where the providers in fact involved themselves in vessel
22  operations.
23        In the case -- the New Filipino case, the person who
24  had contracted with the middle man in fact delivered its
25  services to the ship.  Suddenly it's a maritime contract
SOUTHERN DISTRICT REPORTERS, P.C.<br>(212) 805-0300

49
79otwila                Argument

1   because it involves the trafficking of vessels.  That's what
2   you have to look at, the nature of the service.
3           And while in Hinkins on page 2 of the opinion it says
4   something about the entity not having performed all the
5   services themselves because they are husbandry agents, it says
6   on page 1 very specifically incident to furnishing these
7   traditional husbandry services there was repeated attendants on
8   board the ship by Hinkins.  You have of got to have that
9   connection to maritime commerce.  So the distinction between
10  Exxon is you don't have it with ship.  The distinction between
11  Hinkins and the New Filipino case -- excuse me, Exxon, you
12  don't have the relationship to the ship owner.
13          When it comes to all these other incidentals, the way
14  Wilhelmsen maintained its -- the way it got paid, whether it
15  was a commission or whether it was through arbitrage, whether
16  or not title passed, this is a myth, this whole passage of
17  title.  We recognize Sumitomo put the marine fuel oil on the
18  ship and in the one instantaneous point of time the title
19  passed all the way to the U.S. Navy.
20          The purpose of the Exxon decision in my view is the
21  Supreme Court was telling the District Courts to stop looking
22  at these really irrelevant niceties of the way the contracts
23  were set up, look at the nature of the service that really was
24  provided.  So in my view, how Wilhelmsen was paid doesn't
25  matter, what matters is what they did.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

50

79otwila              Argument

1          When you come back to the contract, there's no
2     conversation here about what Mr. Frevola believes perhaps
3     occurred prior to the sending of this email.  There is no
4     evidence on that, your Honor.  Wilhelmsen came into this Court
5     and said this is the contract.  This document raises more
6     questions than it answers.  So in the Exxon case you had Exxon
7     contracted with the physical supplier and the physical supplier
8     performs, and that was done in furtherance of Exxon's
9     obligation to Waterman.  That was very clear.
10         I contend this document that Wilhelmsen is coming here
11    and said is the contract is in fact less clear.  We don't have
12    a contract clearly between Wilhelmsen and UBS where Wilhelmsen
13    says we're going to sell you this stuff and we are going to get
14    it to the U.S. Navy and then a second contract clearly between
15    Wilhelmsen and Sumitomo where Sumitomo says we will perform for
16    you the undertakings you made to UBS.
17         Instead, it's an odd hybrid that if I were analyzing
18    this on other bases, your Honor, I could come up with a million
19    theories.  Yes, Mr. Frevola has one interpretation that he
20    thinks is a clear two-party contract that just has these other
21    provisions about deliveries.
22         THE COURT:  What's your alternative?
23         MS. VAN HEMMEN:  The alternative is that here the
24    parties -- not only in fact do we know Sumitomo delivered, I
25    think this contract gives rise to a question or an argument

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

51

79otwila                Argument

1   that Sumitomo was the only one who had the obligation to
2   deliver.  It says they're going to deliver, they incorporated
3   their own terms and conditions relevant to the performance of
4   that undertaking.  I am not sure it's at all clear Wilhelmsen
5   has that obligation.
6          I see the other side of it.  I know you can say if you
7   sell a product obviously there's an obligation to deliver the
8   product you sold, but this is an unusual document, your Honor.
9          THE COURT:  No, it's a very standard brokers
10  nomination.  It says in accordance with the instructions from
11  buyers we confirm -- this is sent to UBS by Wilhelmsen.  It
12  says we confirm our verbal order, so obviously there was a
13  telephone call, and we nominate as follows.  Nominate in this
14  context I have always understood to mean this is how we're
15  going to do it.  We confirm our verbal order.
16         MS. VAN HEMMEN:  Ours.
17         THE COURT:  And we nominate.  Nominate means
18  designate.  Nominate means designate.  And we designate to you
19  this is how we intend to perform our contract with you.
20         MS. VAN HEMMEN:  I think it's equally possible of
21  interpreting we confirm our verbal order, the term "our," this
22  is an email from Wilhelmsen where it's calling the order our
23  order, that's correspondence to Sumitomo, your Honor, that they
24  have copied UBS on, is this right, and which is implicit in the
25  contract.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

52

79otwila                    Argument

1        THE COURT:  It is sent to two people at UBS, it's not
2    send to anybody at Sumitomo.
3        MS. VAN HEMMEN:  Why is it our?  Whose order is it?
4    Buyer's order.  Acting in accordance with instructions from
5    you.
6        THE COURT:  We confirm our, yours and mine, our verbal
7    order, the thing that we entered into.  Our is me and you.
8        MS. VAN HEMMEN:  In any event, your Honor, this
9    document that they call the contract makes perfectly clear,
10    more so than in the other bunker brokers cases that I have
11    reviewed in connection with this case and others, that is a
12    third party at all times, was intended to perform, and it was
13    Sumitomo.  In fact, there's terms and conditions that Sumitomo
14    threw into the pot relevant to their providing that service.
15    That service relates to the trafficking of vessels.  The
16    service UBS undertook to the Navy does.  What Wilhelmsen did in
17    the middle we contend does not, your Honor.
18        MR. FREVOLA:  Your Honor, if I may have one point.  If
19    the title shifting was such a myth, Mr. Borge's paragraph 18
20    talks about the fact that UBS has threatened Wilhelmsen with
21    legal action for contaminated bunkers provided to the Bruce
22    C. Heasen (ph) on October 23rd last year, your Honor.  And in
23    the first conference we held before your Honor about two weeks
24    ago, UBS reserved their right to seek counter security under
25    Rule E7A for that counterclaim.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

53

79otwila                    Argument

1          THE COURT:  Yes.
2          MR. FREVOLA:  If there was such a myth and there was
3    no contract here where our client or Wilhelmsen was required to
4    perform and to get it right, then why that counterclaim -- they
5    shouldn't have brought that counterclaim.
6          THE COURT:  You're both middle men.  This is the irony
7    here.  We don't have a ship owner, we don't have the supplier,
8    we have the ship owner's middle man and the oil supplier's
9    middle man here.  These are two middle men.
10          MS. VAN HEMMEN:  Your Honor, I would like to point
11    out, we don't deny that there's a contract between UBS and
12    Wilhelmsen, the contract for sale, and that was a mechanism of
13    providing finance.  So I felt that Mr. Frevola thought perhaps
14    I was denying a contract existed, I'm not.
15          THE COURT:  No, what he's saying is that your position
16    that this document could be read as a contract between UBS and
17    Sumitomo doesn't work with your argument in paragraph 18 or
18    with the fact that your client has already threatened
19    Wilhelmsen with litigation because it supplied a defective
20    product, a contaminated bunker.  And your client did not sue
21    Sumitomo for that, it sued the person that -- or it threatened
22    to sue the person that it was looking to for performance of the
23    supply agreement.
24          What's much more interesting to me is whether a
25    contract between two brokers -- not the supplier and not the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

54

79otwila                Argument

1   ship, but two brokers, two intermediaries, which is not exactly
2   the Exxon case -- can be a maritime contract.
3        MR. FREVOLA:  Your Honor, one last thing I was going
4   to say is that we were trying in terms of offering to go
5   forward in New York to try to limit the motion practice before
6   your Honor.  If having to amend is going to cause that much of
7   a headache, I guess we'll just deal with the motion when they
8   say that there's no arbitration clause when it comes.
9        THE COURT:  If I were you I would start litigating the
10  underlying merits of this dispute somewhere knowing that you'll
11  be met by a motion.
12       Okay.  Well, it's intriguing, I hate not to rule from
13  the bench, but I didn't have all of these cases with me over
14  the weekend, so that means I guess I have to write.  Well, I'll
15  need something to do during my jury trial.
16       Okay.  Anything else from either one of you?
17       MS. VAN HEMMEN:  Your Honor, the forum non conveniens
18  claim, I guess that was an issue that would evolve later.
19       THE COURT:  Of course it would evolve later.  Right
20  now the only claim that is pending before me is a claim for
21  injunction in aid of arbitration.  It's a claim for a
22  provisional remedy.  It's a claim for an attachment.
23       MS. VAN HEMMEN:  I guess I have, as of this morning,
24  attempted to supplement the basis for my motion to vacate to
25  include a defect arising out of the fact that the factual

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

55

79otwila                Argument

1 allegations in the amended complaint are no longer true, and so
2 I'm wondering how I should proceed on that.
3         THE COURT:  You shouldn't proceed on that.  You have
4 argued it, I hear you, I have to tell you I'm going to reject
5 that argument because they don't know where they're going to
6 litigate it at the present time.  And if they smell and they
7 are smelling that it's going to be a problem for them to
8 litigate in New York and they might end up in Australia,
9 they're going to go to London.  And then the only thing that
10 would be left for me to decide at some point in the future is
11 whether the arbitration clause in the Sumitomo terms and
12 conditions binds you to arbitrate in London.
13         You're jumping way ahead of the game with forum non
14 conveniens.  You have no complaint yet that asserts a claim
15 that you could ask me to dismiss on forum non conveniens
16 grounds.  I certainly can't dismiss the claim for the
17 injunction in aid of arbitration on forum non conveniens
18 grounds.
19         MS. VAN HEMMEN:  But in light of the fact that they're
20 not doing it --
21         THE COURT:  He made a statement in a brief that they
22 might do something or they might not do something.
23         I am rejecting your argument.  I have already told you
24 that if in three months they're not litigating somewhere I'm
25 going to vacate the attachment sua sponte.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

56
79otwila                Argument
1          MS. VAN HEMMEN:  Yes, your Honor.
2          THE COURT:  I'm not going to keep it going forever if
3    they're not litigating somewhere.  I might even move that up to
4    one month.  There will not be an attachment without an
5    underlying litigation pending somewhere very soon.  Very, very
6    soon.  Okay.
7          MR. FREVOLA:  Thank you, your Honor.
8          MS. VAN HEMMEN:  Thank you, your Honor.
9              o0o
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300